THE UNITED STATES, APPELLANTS, *v.* THE LIBELLANTS AND CLAIMANTS OF THE SCHOONER AMISTAD, HER TACKLE, APPAREL, AND FURNITURE, TOGETHER WITH HER CARGO, AND THE AFRICANS MENTIONED AND DESCRIBED IN THE SEVERAL LIBELS AND CLAIMS, APPELLEES.

The Spanish schooner Amistad, on the 27th day of June, 1839, cleared out from Havana, in Cuba, for Puerto Principe, in the same island, having on board, Captain Ferrer, and Ruiz and Montez, Spanish subjects. Captain Ferrer had on board Antonio, a slave; Ruiz had forty-nine negroes; Montez had four negroes, which were claimed by them as slaves, and stated to be their property, in passports or documents, signed by the Governor General of Cuba. In fact, these African negroes had been, a very short time before they were put on board the Amistad, brought into Cuba, by Spanish slave traders, in direct contravention of the treaties between Spain and Great Britain, and in violation of the laws of Spain. On the voyage of the Amistad, the negroes rose, killed the captain, and took possession of the vessel. They spared the lives of Ruiz and Montez, on condition that they would aid in steering the Amistad for the coast of Africa, or to some place where negro slavery was not permitted by the laws of the country. Ruiz and Montez deceived the negroes, who were totally ignorant of navigation, and steered the Amistad for the United States; and she arrived off Long Island, in the state of New York, on the 26th of August, and anchored within half a mile of the shore. Some of the negroes went on shore to procure supplies of water and provisions, and the vessel was then discovered by the United States brig Washington. Lieutenant Gedney, commanding the Washington assisted by his officers and crew, took possession of the Amistad, and of the negroes on shore and in the vessel, brought them into the District of Connecticut, and there libelled the vessel, the cargo, and the negroes for salvage. Libels for salvage were also presented in the District Court of the United States, for the District of Connecticut, by persons who had aided, as they alleged, in capturing the negroes on shore on Long Island, and contributed to the vessel, cargo, and negroes being taken into possession by the brig Washington. Ruiz and Montez filed claims to the negroes as their slaves, and prayed that they, and parts of the cargo of the Amistad, might be delivered to them, or to the representatives of the crown of Spain. The attorney of the District of Connecticut filed an information stating that the Minister of Spain had claimed of the government of the United States that the vessel, cargo, and slaves should be restored, under the provisions of the treaty between the United States and Spain, the same having arrived within the limits and jurisdiction of the United States, and had been taken possession of by a public armed vessel of the United States, under such circumstances as made it the duty of the United States to cause them to be restored to the true owners thereof. The information asked that the Court would make such order as would enable the United States to comply with the treaty; or, if it should appear that the negroes had been

[The United States *v.* The Amistad.]

brought from Africa, in violation of the laws of the United States, that the Court would make an order for the removal of the negroes to Africa, according to the laws of the United States. A claim for Antonio was filed by the Spanish consul, on behalf of the representatives of Captain Ferrer, and claims are also filed by merchants of Cuba for parts of the cargo of the vessel, denying salvage, and asserting their right to have the same delivered to them under the treaty. The negroes, Antonio excepted, filed an answer denying that they were slaves, or the property of Ruiz, or Montez; and denying the right of the Court under the Constitution and laws of the United States to exercise any jurisdiction over their persons. They asserted that they were native free-born Africans, and ought of right to be free; that they had been, in April 1839, kidnapped in Africa, and had been carried in a vessel engaged in the slave trade from the coast of Africa to Cuba, for the purpose of being sold; and that Ruiz and Montez, knowing these facts, had purchased them, put them on board the Amistad, intending to carry them to be held as slaves for life, to another part of Cuba, and that, on the voyage, they rose on the master, took possession of the vessel, and were intending to proceed to Africa, or to some free state, when they were taken possession of by the United States armed vessel, the Washington. After evidence had been given by the parties, and all the documents of the vessel and cargo, with the alleged passports, and the clearance from Havana had been produced, the District Court made a decree, by which all claims to salvage of the negroes were rejected, and salvage amounting to one-third of the vessel and cargo, was allowed to Lieutenant Gedney, and the officers and crew of the Washington. The claim of the representatives of Captain Ferrer, to Antonio, was allowed: the claims of Ruiz and Montez being included in the claim of the Spanish minister, and of the minister of Spain, to the negroes as slaves, or to have them delivered to the Spanish minister, under the treaty, to be sent to Cuba, were rejected: and the Court decreed that the negroes should be delivered to the President of the United States, to be sent to Africa, pursuant to the act of Congress of 3d March, 1819. From this decree the District Attorney of the United States appealed to the Circuit Court, except so far as the same related to Antonio. The owners of the cargo of the Amistad also appealed from that part of the decree which allowed salvage on their goods. Ruiz or Montez did not appeal, nor did the representatives of the owner of the Amistad. The Circuit Court of Connecticut, by a pro forma decree, affirmed the decree of the District Court, reserving the question of salvage on the merchandise on board the Amistad. The United States appealed from this decree. The decree of the Circuit Court was affirmed; saving that part of the same, which directed the negroes to be delivered to the President of the United States, to be sent to Africa; which was reversed, and the negroes were declared to be free.

The sixth article of the treaty with Spain, of 1795, continued in full force, in this particular, by the treaty ratified in 1821, seems to have had principally in view, cases where the property of the subjects of either state, had been taken possession of within the territorial jurisdiction of the other, during war. The eighth article provides for cases where the shipping of the inhabitants of either state are forced, through stress of weather, pursuit of pirates, or enemies, or any other urgent necessity, to seek shelter in the ports of the other. There may well be some doubts entertained whether the case of the Amistad, in its actual circumstances, falls within the purview of this article.

The ninth article of the treaty provides, that all ships and merchandise, which shall

[The United States *v*. The Amistad.]

be rescued out of the hands of any pirates and robbers, on the high seas, which shall be brought into some port of either state, shall be delivered to the officers of the port in order to be taken care of, and "restored entire to the proprietary, as soon as due and sufficient proof shall be made concerning the property thereof." To bring the case of the Amistad within this article, it is essential to establish: First, that the negroes, under all the circumstances, fall within the description of merchandise, in the sense of the treaty. Secondly, That there has been a rescue of them on the high seas, out of the hands of pirates and robbers. Thirdly, That Ruiz and Montez are the true proprietors of the negroes, and have established their title by competent proofs. If those negroes were, at the time, lawfully held as slaves under the laws of Spain, and recognised by those laws as property capable of being bought and sold, no reason is seen why this may not be deemed, within the intent of the treaty, to be included under the denomination of merchandise, and ought, as such, to be restored to the claimants; for upon that point the laws of Spain would seem to furnish the proper rule of interpretation. But, admitting that to be the construction of the treaty, it is clear in the opinion of the Court, that neither of the other essential facts and requisites has been established by proof and the onus probandi of both lies upon the claimants, to give rise to the casus fœderis.

The negroes were never the lawful slaves of Ruiz, or Montez, or of any other Spanish subject. They are natives of Africa; and were kidnapped there, and were unlawfully transported to Cuba, in violation of the laws and treaties of Spain, and of the most solemn edicts and declarations of that government.

By the laws, treaties, and edicts of Spain, the African slave trade is utterly abolished; the dealing in that trade is deemed a heinous crime; and the negroes thereby introduced into the dominions of Spain, are declared to be free.

There is no pretence to say the negroes of the Amistad are "pirates" and "robbers;" as they were kidnapped Africans, who, by the laws of Spain itself were entitled to their freedom.

Although public documents of the government accompanying property found on board of the private ships of a foreign nation, are to be deemed prima facie evidence of the facts which they state, yet they are always open to be impugned for fraud; and whether that fraud be in the original obtaining of those documents, or in the subsequent fraudulent and illegal use of them, where once it is satisfactorily established, it overthrows all their sanctity, and destroys them as proof.

Fraud will vitiate any, even the most solemn transactions; and any asserted title founded upon it, is utterly void.

The language of the treaty with Spain of 1795, requires the proprietor "to make due and sufficient proof" of his property; and that proof cannot be deemed either due or sufficient, which is stained with fraud.

Nothing is more clear in the laws of nations as an established rule to regulate their rights and duties, and intercourse, than the doctrine that the ship's papers are prima facie evidence of what they state; and that if they are shown to be fraudulent, they are not to be held proof of any valid title whatever. This rule is applied in prize cases; and is just as applicable to the transactions of civil intercourse between nations in times of peace.

In the solemn treaties between nations it never can be presumed that either state intends to provide the means of perpetrating or protecting frauds; but all the provisions are to be construed as intended to be applied to bona fide transactions.

[The United States *v.* The Amistad.]

The seventeenth article of the treaty with Spain which provides for certain passports and certificates as evidence of property on board of the ships of both states, is, in its terms, applicable only to cases where either of the parties is engaged in war. This article required a certain form of passport to be agreed upon by the parties and annexed to the treaty. It never was annexed: and, therefore, in the case of The Amiable Isabella, 6 Wheaton, 1, it is held inoperative.

Supposing the African negroes on board the Amistad not to be slaves, but kidnapped, and free negroes, the treaty with Spain cannot be obligatory upon them; and the United States are bound to respect their rights, as much as those of Spanish subjects. The conflict of rights between the parties, under such circumstances, becomes positive and inevitable, and must be decided upon the invariable principles of justice and international law.

The treaty with Spain never could have been intended to take away the equal rights of all foreigners who should assert their claims to equal justice before the Courts of the United States; or to deprive such foreigners of the protection given to them by other treaties, or by the general laws of nations.

There is no ground to assert that the case of the negroes who were on board of the Amistad comes within the provisions of the act of Congress of 1799, or of any other of the prohibitory slave-trade acts. These negroes were never taken from Africa, or brought to the United States in contravention of these acts. When the Amistad arrived she was in possession of the negroes, asserting their freedom; and in no sense could possibly intend to import themselves into the United States as slaves, or for sale as slaves.

The carrying of the Amistad and her cargo into Connecticut by Lieutenant Gedney, and the officers and crew of the Washington, was a highly meritorious and useful service to the proprietors of the ship and cargo, and such, as by the general principles of the maritime law, is always deemed a just foundation for salvage. The rate allowed by the Court, (one-third,) does not seem beyond the exercise of a sound discretion, under the very peculiar and embarrassing circumstances of the case.

ON appeal from the Circuit Court of the United States for the District of Connecticut.

On the 23d day of January, 1840, Thomas R. Gedney, and Richard W. Meade, officers of the United States surveying brig Washington, on behalf of themselves and the officers and crew of the brig Washington, and of others interested and entitled, filed a libel in the District Court of the United States, for the District of Connecticut, stating that off Culloden Point, near Montauck Point, they took possession of a vessel which proved to be a Spanish schooner called the Amistad, of Havana, in the island of Cuba, of about 120 tons burden; and the said libellants found said schooner was manned by forty-five negroes, some of whom had landed near the said point for water;

2 x 2                    66

and there were also on board, two Spanish gentlemen, who represented themselves to be, and, as the libellants verily believe were part owners of the cargo, and of the negroes on board, who were slaves, belonging to said Spanish gentlemen; that the schooner Amistad sailed on the 28th day of June, A. D. 1839 from the port of Havana, bound to a port in the province of Principe, both in the island of Cuba, under the command of Raymon Ferrer as master thereof: that the schooner had on board and was laden with a large and valuable cargo, and provisions, to the amount, in all, of forty thousand dollars, and also money to the sum and amount of about two hundred and fifty dollars; and also fifty-four slaves, to wit, fifty-one male slaves, and three young female slaves, who were worth twenty-five thousand dollars; and while on the voyage from Havana to Principe, the slaves rose upon the captain and crew of the schooner, and killed and murdered the captain and one of the crew, and two more of the crew escaped and got away from the schooner; that the two Spaniards on board, to wit, Pedro Montez, and Jose Ruiz, remained alive on board the schooner after the murder of the captain, and after the negroes had taken possession of the vessel and cargo; that their lives were spared to assist in the sailing of the vessel; and it was directed by the negroes, that the schooner should be navigated for the coast of Africa; and Pedro Montez, and Jose Ruiz did, accordingly, steer as thus directed and compelled by the negroes, at the peril of their lives, in the daytime, and in the night altered their course and steered for the American shore; but after two months on the ocean, they succeeded in coming round Montauck Point, then they were discovered and boarded by the libellants, and the two Spanish gentlemen begged for and claimed the aid and protection of the libellants. That the schooner was accordingly taken possession of, and recaptured from the hands and possession of the negroes who had taken the same; that the schooner was brought into the port of New London, where she now is; and the schooner would with great difficulty, exposure, and danger have been taken by the libellants, but for the surprise upon the blacks who had possession thereof, a part of whom were on shore; and but for the aid and assistance and services of the libellants, the vessel and cargo would have been wholly lost to the respective owners thereof. That the cargo

belongs to divers Spanish merchants and others, resident in the island of Cuba, and to Pedro Montez and Jose Ruiz, the latter owning most of the slaves.

The libellants stated, that having saved the schooner Amistad and cargo, and the slaves, with considerable danger, they prayed that process should be issued against the same, and that the usual proceedings might be had by the Court, by which a reasonable salvage should be decreed out of the property so saved.

Afterwards, Henry Green and Pelatiah Fordham, and others, filed a petition and answer to the libel, claiming salvage out of the property proceeded against by Thomas R. Gedney and others, and stating that before the Amistad was seen or boarded by the officers and crew of the Washington, they had secured a portion of the negroes who had come on shore, and had thus aided in saving the vessel and cargo.

On the 29th of August, 1839, Jose Ruiz and Pedro Montez, of Cuba, filed claims to all the negroes on board of the Amistad, except Antonio, as their slaves. A part of the merchandise on board the vessel was also claimed by them. They alleged that the negroes had risen on the captain of the schooner, and had murdered him; and that afterwards they, Ruiz and Montez, had brought her into the United States. They claimed that the negroes and merchandise ought to be restored to them, under the treaty with Spain; and denied salvage to Lieutenant Gedney, and to all other persons claiming salvage.

Afterwards, Ruiz and Montez each filed in the District Court, a separate libel, stating more at large the circumstances of the voyage of the Amistad, the murder of the captain by the negroes, and that the negroes afterwards compelled them to steer the vessel towards Africa, but that they contrived to bring her to the coast of the United States, where she was captured by the United States brig Washington. Ruiz, in his libel, stated the negroes belonging to him to have been forty-nine in number, "named and known at Havana, as follows: Antonio, Simon, Jose, Pedro, Martin, Manuel, Andreo, Edwards, Celedonia, Burtolono, Ramia, Augustin, Evaristo, Casamero, Merchoi, Gabriel, Santorion, Escolastico, Rascual, Estanislao, Desidero, Nicholas, Estevan, Tomas, Cosme, Luis, Bartolo, Julian, Federico, Salus-

tiano, Ladislao, Celestino, Epifanio, Eduardo, Benancico, Felepe, Francisco, Hipoleto, Berreto, Isidoro, Vecente, Deconisco, Apolonio, Esequies, Leon, Julio, Hipoleto, and Zenon; of whom several have died." Their present names, Ruiz stated, he had been informed, were, "Cinque, Burnah 1st, Carpree, Dammah, Fourrie 1st, Shumah, Conomah, Choolay, Burnah 2d, Baah, Cabbah, Poomah, Kimbo, Peeà, Bang-ye-ah, Saah, Carlee, Parale, Morrah, Yahome, Narquor, Quarto, Sesse, Con, Fourrie 2d, Kennah, Lammane, Fajanah, Faah, Yahboy, Faquannah, Berrie, Fawnu, Chockammaw, and Gabbow."

The libel of Pedro Montez stated that the names of three negroes on board the Amistad, belonging to him, were Francisco, Juan, and Josepha; the Spanish name of the fourth was not mentioned; and the four were now called Teme, Mahgra, Kene, and Carria.

All these were stated to be slaves, and the property of the claimants, purchased by them at Havana; where slavery is tolerated and allowed by law; and they and the merchandise on board the vessel, the claimants alleged, by the laws and usages of nations, and of the United States of America, and according to the treaties between Spain and the United States, ought to be restored to the claimants without diminution, and entire.

The vessel, negroes, and merchandise were taken into his possession, by the Marshal of the district of Connecticut, under process issued by order of the Court.

On the 19th of September, 1837, William S. Holabird, Esq., attorney of the United States, for the district, filed a suggestion in the District Court, stating that, since the libel aforesaid, of Thomas R. Gedney, Esq., was filed in this Court, viz. within the present month of September, in the year of our Lord 1839, the duly accredited minister to the United States, of her Catholic Majesty, the Queen of Spain, had officially presented to the proper department of the United States government, a claim, which is now pending, upon the United States, setting forth that "the vessel aforesaid, called the Amistad, and her cargo aforesaid, together with certain slaves on board the said vessel, all being the same as described in the libel aforesaid, are the property of Spanish subjects, and that the said vessel, cargo, and slaves, while so being the property of the said Spanish subjects, arrived

within the jurisdictional limits of the United States, and were taken possession of by the said public armed brig of the United States, under such circumstances as make it the duty of the United States to cause the same vessel, cargo, and slaves, being the property of said Spanish subjects, to be restored to the true proprietors and owners of the same without further hindrance or detention, as required by the treaty now subsisting between the United States and Spain." The attorney of the United States, in behalf of the United States, prayed the Court, on its being made legally to appear that the claim of the Spanish minister is well founded, and is conformable to the treaty, that the Court make such order for the disposal of the said vessel, cargo, and slaves as may best enable the United States in all respects to comply with their treaty stipulations, and preserve the public faith inviolate. But if it should be made to appear that the persons described as slaves, are negroes and persons of colour, who have been transported from Africa, in violation of the laws of the United States, and brought within the United States, contrary to the same laws, the attorney, in behalf of the United States, claimed that, in such case, the Court will make such further order in the premises as may enable the United States, if deemed expedient, to remove such persons to the coast of Africa to be delivered there to such agent or agents as may be authorized to receive and provide for them, pursuant to the laws of the United States, in such case provided, or to make such other order as to the Court may seem fit, right, and proper in the premises."

On the same day, September 19, 1839, the negroes, by their counsel, filed an answer to the libel of Lieutenant Gedney and others, claiming salvage, and to the claim of Ruiz and Montez, claiming them as slaves, as also to the intervention of the United States, on the application of the minister of Spain; in which they say, that they are natives of Africa, and were born free, and ever since have been and still of right are and ought to be free and not slaves; that they were never domiciled in the island of Cuba, or in the dominions of the Queen of Spain, or subject to the laws thereof. That on or about the 15th day of April, 1839, they were, in the land of their nativity, unlawfully kidnapped, and forcibly, and wrongfully, by certain persons to them un-

known, who were there unlawfully and piratically engaged in the slave trade between the coast of Africa and the island of Cuba, contrary to the will of these respondents, unlawfully, and under circumstances of great cruelty, transported to the island of Cuba for the unlawful purpose of being sold as slaves, and were there illegally landed for that purpose. That Jose Ruiz, one of the libellants, well knowing all the premises, and confederating with the persons by whom the respondents were unlawfully taken and holden as slaves, and intending to deprive the respondents severally of their liberty, made a pretended purchase of the respondents, except the said Carria, Teme, Kene, and Mahgra; and that Pedro Montez, also well knowing all the premises, and confederating with the said persons for the purpose aforesaid, made a pretended purchase of the said Carria, Teme, Kene, and Mahgra; that the pretended purchases were made from persons who had no right whatever to the respondents or any of them, and that the same were null and void, and conferred no right or title on Ruiz or Montez, or right of control over the respondents or either of them. That on or about the 28th day of June, 1839, Ruiz and Montez, confederating with each other, and with one Ramon Ferrer, now deceased, captain of the schooner Amistad, and others of the crew thereof, caused respondents severally, without law or right, under color of certain false and fraudulent papers by them procured and fraudulently used for that purpose, to be placed by force on board the schooner to be transported with said Ruiz and Montez to some place unknown to the respondents, and there enslaved for life. That the respondents, being treated on board said vessel by said Ruiz and Montez and their confederates with great cruelty and oppression, and being of right free as aforesaid, were incited by the love of liberty natural to all men, and by the desire of returning to their families and kindred, to take possession of said vessel while navigating the high seas, as they had a right to do, with the intent to return therein to their native country, or to seek an asylum in some free state, where slavery did not exist, in order that they might enjoy their liberty under the protection of its government; that the schooner, about the 26th of August, 1839, arrived in the possession of the respondents, at Culloden Point near Montauk, and was there anchored near the shore of Long Island, within

hailing distance thereof, and within the waters and territory of the state of New York; that the respondents, Cinque, Carlee, Dammah, Baah, Monat, Nahguis, Quato, Con, Fajanah, Berrie, Gabbo, Fouleaa, Kimbo, Faquannah, Cononia, otherwise called Ndzarbla, Yaboi, Burnah 1st, Shuma, Fawne, Peale, Ba, and Sheele, while said schooner lay at anchor as aforesaid, went on shore within the state of New York to procure provisions and other necessaries, and while there, in a state where slavery is unlawful and does not exist, under the protection of the govern-ment and laws of said state by which they were all free, whether on board of said schooner, or on shore, the respondents were severally seized, as well those who were on shore as aforesaid, as those who were on board of and in possession of said schooner, by Lieutenant Gedney, his officers, and crew of the United States brig Washington, without any lawful warrant or authority what-ever, at the instance of Ruiz and Montez, with the intent to keep and secure them as slaves to Ruiz and Montez, respectively, and to obtain an award of salvage therefor, from this honourable Court, as for a meritorious act. That for that purpose, the respondents were, by Lieutenant Gedney, his officers and crew, brought to the port of New London; and while there, and after-wards, under the subsequent proceedings in this honourable Court taken into the custody of the marshal of said district of Connecticut, and confined and held in the jails in the cities of New Haven and Hartford, respectively, as aforesaid. Where-fore, the respondents pray that they may be set free, as they of right are and ought to be, and that they be released from the custody of the marshal, under the process of this honourable Court, under which, or under colour of which they are holden as aforesaid.

Jose Antonio Tellincas, and Aspe and Laca, subjects of Spain, and merchants of Cuba, presented claims for certain merchan-dise which was on board the Amistad when taken possession of by Lieutenant Gedney; denying all claims to salvage, and asking that the property should be restored to them.

On the 23d day of January the District Judge made a decree, having taken into his consideration all the libels, claims, and the suggestion of the District Attorney of the United States, and the claim preferred by him that the negroes should be delivered to

the Spanish authorities, the negroes to be sent by them to Cuba, or that the negroes should be placed under the authority of the President of the United States, to be transported to Africa.

The decree rejected the claim of Green and others to salvage with costs. The claim of Lieutenant Gedney and others to salvage on the alleged slaves was dismissed. The libels and claims of Ruiz and Montez being included under the claim of the minister of Spain, were ordered to be dismissed, with costs taxed against Ruiz and Montez respectively.

"That that part of the claim of the minister of Spain which demands the surrender of Cinques and others, who are specifically named in the answer filed as aforesaid, be dismissed, without cost."

That the claim of the vice consul of Spain, demanding the surrender to the Spanish government of Antonio, a slave owned by the heirs of Captain Ferrer, should be sustained; and ordered that Antonio should be delivered to the government of Spain, or its agent, without costs.

The claims of Tellincas and Aspe and Laca, for the restoration of the goods specified by them, being part of the cargo of the Amistad, was sustained, and that the same goods be restored to them, deducting one-third of the gross appraised value of them, which was allowed as salvage to the officers and crew of the Washington. A like salvage of one-third of the gross value of the Amistad, and the other merchandise on board of her, was also adjudged to the salvors. The costs were to be deducted from the other two-thirds.

"And, whereas the duly accredited minister of Spain, resident in the United States, hath, in behalf of the government of Spain, for the owners of said schooner, and the residue of said goods, claimed that the same be restored to that government for the said owners, they being Spanish subjects, under the provisions of the treaty subsisting between the United States and Spain: And, whereas it hath been made to appear to this Court, that the said schooner is lawfully owned by the subjects of Spain, as also the residue of said goods not specifically claimed: And, whereas the aforesaid Don Pedro Montez, and Jose Ruiz, have in person ceased to prosecute their claim as specified in their respective libels, and their said claims fall within the de-

mand and claim of the Spanish minister, made as aforesaid: And, whereas the seizure of the said schooner and goods by the said Thomas R. Gedney and others, was made on the high seas, in a perilous condition, and they were first brought into the port of New London, within the District of Connecticut, and libelled for salvage,"

[The decree then proceeds to adjudge to Lieutenant Gedney and others, as salvage, one-third of the gross proceeds of the vessel and cargo, according to an appraisement which had been made thereof; and, if not paid, directed the property to be sold, and that proportion of the gross proceeds of the sale to be paid over to the captors, the residue, after payment of all costs, to be paid to the respective owners of the same.]

Upon the answers of the negroes, and the representations of the District Attorney of the United States, and of Montez and Ruiz, the decree proceeds:

"This Court having fully heard the parties appearing with their proofs, do find that the respondents, severally answering as aforesaid, are each of them natives of Africa, and were born free, and ever since have been, and still of right are free, and not slaves, as is in said several libels, claims or representations alleged or surmised; that they were never domiciled in the Island of Cuba, or the dominions of the Queen of Spain, or subject to the laws thereof; that they were severally kidnapped in their native country, and were, in violation of their own rights, and of the laws of Spain, prohibiting the African slave trade, imported into the island of Cuba, about the 12th June, 1839, and were there unlawfully held and transferred to the said Ruiz and Montez, respectively; that said respondents were within fifteen days after their arrival at Havana, aforesaid, by said Ruiz and Montez, put on board said schooner Amistad to be transported to some port in said island of Cuba, and there unlawfully held as slaves; that the respondents or some of them, influenced by the desire of recovering their liberty, and of returning to their families and kindred in their native country, took possession of said schooner Amistad, killed the captain and cook, and severely wounded said Montez, while on her voyage from Havana, as aforesaid, and that the respondents arrived in possession of said schooner at Culloden Point near Montauck, and there anchored

said schooner on the high seas, at the distance of half a mile from the shore of Long Island, and were there, while a part of the respondents were, as is alleged in their said answer, on shore in quest of water and other necessaries, and about to sail in said schooner for the coast of Africa, seized by said Lieutenant Gedney, and his officers and crew, and brought into the port of New London, in this district. And this Court doth further find, that it hath ever been the intention of the said Montez and Ruiz, since the said Africans were put on board the said schooner, to hold the said Africans as slaves; that at the time when the said Cinque and others, here making answer, were imported from Africa into the dominions of Spain, there was a law of Spain prohibiting such importations, declaring the persons so imported to be free; that said law was in force when the claimants took the possession of the said Africans and put them on board said schooner, and the same has ever since been in force."

The decree of the District Court recites the decree of the government of Spain of December, 1817, prohibiting the slave trade, and declaring all negroes brought into the dominions of Spain by slave traders to be free; and enjoining the execution of the decree on all the officers of Spain in the dominions of Spain.

The decree of the District Court proceeds:

"And this Court doth further find, that when the said Africans were shipped on board the said schooner, by the said Montez and Ruiz, the same were shipped under the passports signed by the Governor General of the Island of Cuba, in the following words, viz.:

| *Description.* | *Havana, June 22d,* 1839. |
|---|---|
| Size. | I grant permission to carry three black ladinoes, named Juana, Francisca, and Josefa, property of Dr. Pedro Montez, to Puerto Principe, by sea. They must present themselves to the respective territorial judge with this permit. |
| Age. | |
| Colour. | |
| Hair. | |
| Forehead. | |
| Eyebrows. | Duty, 2 reals.     ESPLETA. |
| Eyes. | (Endorsed)    Commander of Matria. |
| Nose. | |
| Mouth. | Let pass in the schooner Amistad, to Guanaja, Ferrer, master. Havana, June 27th, 1839 |
| Beard. | |
| *Peculiar signs.* | MART & Co. |

[The United States v. The Amistad.]

Description.
Size.
Age.
Colour.
Hair.
Forehead.
Eyebrows.
Eyes.
Nose.
Mouth.
Beard.
Peculiar signs.

*Havana, June 26th,* 1839.

I grant permission to carry forty-nine black ladinos, named Antonio, Simon, Lucas, Jose, Pedro, Martin, Manuel, Andrios, Ědwardo, Celedernnio, Bartolo, Raman, Augustin, Evaristo, Casimero, Meratio, Gabriel, Santome, Ecclesiastico, Pasenal, Stanislao, Desiderio, Nicolas, Estevan, Tomas, Cosme, Luis, Bartolo, Julian, Federico, Saturdino, Ladislas, Celestino, Epifano, Fronerie, Venaniro, Feligre, Francisco, Hypolito, Benito, Isdoro, Vicente, Dioniceo, Apolino, Esequiel, Leon, Julio, Hipolito, y Raman, property of Dr. Jose Ruiz, to Puerto Principe, by sea. They must present themselves with this permit to the respective territorial judge.

ESPLETA.

Duty, 2 reals.

(Endorsed)        Commander of Matria.

Let pass in the schooner Amistad, to Guanaja, Ferrer, master. Havana, June 27th, 1839.

MART & Cỏ."

"Which said passports do not truly describe the said persons shipped under the same. Whereupon, the said claim of the minister of Spain, as set forth in the two libels filed in the name of the United States by the said District Attorney, for and in behalf of the government of Spain and her subjects, so far as the same relate to the said Africans named in said claim, be dismissed."

"And upon the libel filed by said District Attorney in behalf of the United States, claiming the said Africans libelled as aforesaid, and now in the custody of the Marshal of the district of Connecticut, under and by virtue of process issued from this Court, that they may be delivered to the President of the United States to be transported to Africa. It is decreed that the said Africans now in the custody of said Marshal, and libelled and claimed as aforesaid, (excepting Antonio Ferrer, be delivered to the President of the United States by the Marshal of the district of Connecticut, to be by him transported to Africa, in pursuance

of the law of Congress, passed March 3d, 1819, entitled 'An act in addition to the acts prohibiting the slave trade.' "

After the decree was pronounced, the United States, "claiming in pursuance of a demand made upon them by the duly accredited minister of her Catholic Majesty, the Queen of Spain, to the United States, moved an appeal from the whole and every part of the said decree, except part of the same in relation to the slave Antonio, to the Circuit Court" of Connecticut.

Antonio Tellincas, and Aspe and Laca, claimants, &c., also appealed from the decree to the Circuit Court, except for so much of the decree as sustains their claims to the goods, &c.

The Africans, by their African names, moved in the Circuit Court, in April, 1840, that so much of the appeal of the District Attorney of the United States, from so much of the decree of the District Court as related to them severally, may be dismissed; "because, they say that the United States do not claim, nor have they ever claimed any interest in the appellees, respectively, or either of them, and have no right, either by the law of nations, or by the Constitution or laws of the United States to appear in the Courts of the United States, to institute or prosecute claims to property, in behalf of the subjects of the Queen of Spain, under the circumstances appearing on the record in this case; much less to enforce the claims of the subject of a foreign government, to the persons of the said appellees, respectively, as the slaves of the said foreign subjects, under the circumstances aforesaid."

The Circuit Court refused the motion.

The Circuit Court affirmed the decree of the District Court, pro forma, except so far as respects the claims of Tellincas, and Aspe and Laca.

After this decree of the Circuit Court, the United States, claiming in pursuance of a demand made upon them by the duly accredited minister of her Catholic Majesty, the Queen of Spain to the United States, moved an appeal from the whole and every part of the decree of the Court, affirming the decree of the District Court to the Supreme Court of the United States, to be holden at the city of Washington, on the second Monday of January, A. D. eighteen hundred and forty-one; and it was allowed.

The Court as far as respects the decree of the District Court allowing salvage on the goods on board the Amistad, continued the case to await the decision of the Supreme Court, on that part of the decree appealed from.

The Circuit Court in the decree, proceed to say, that "they had inspected certain depositions and papers remaining as of record in said Circuit Court, and to be used as evidence, before the Supreme Court of the United States, on the trial of said appeal."

Among the depositions, were the following.

"I, Richard Robert Madden, a British subject, having resided for the last three years and upwards, at Havana, where I have held official situations under the British government, depose and say, that I have held the office of superintendent of liberated Africans during that term, and still hold it; and have held for the term of one year, the office there, of British commissioners, in the Mixed Court of Justice. The duties of my office and of my avocation, have led me to become well acquainted with Africans recently imported from Africa. I have seen and had in my charge many hundreds of them. I have also seen the Africans in the custody of the marshal of the district of Connecticut, except the small children. I have examined them and observed their language, appearance, and manners; and I have no doubt of their having been, very recently, brought from Africa. To one of them, I spoke, and repeated a Mohammedan form of prayer in the Arabic language; the man immediately recognised the language, and repeated a few words of it after me, and appeared to understand it, particularly the words 'Allah akbar,' or God is great. The man who was beside this negro, I also addressed in Arabic, saying—'salaam ailkoem,' or peace be to you; he immediately, in the customary oriental salutations, replied—'aleckoum salaam,' or peace be on you. From my knowledge of oriental habits, and of the appearance of the newly imported slaves in Cuba, I have no doubt of those negroes of the Amistad being bona fide Bozal negroes, quite newly imported from Africa. I have a full knowledge of the subject of slavery—slave trade in Cuba; and I know that no law exists, or has existed since the year 1820, that sanctions the introduction of negroes into the island of Cuba, from Africa for the urpose of making slaves, or being held in slavery; and, that

2 Y 2

all such Bozal negroes, as those recently imported are called, are legally free; and no law, common or statute, exists there, by which they can be held in slavery. Such Africans, long settled in Cuba, and acclimated, are called ladinos, and must have been introduced before 1820, and are so called in contradistinction to the term creole, which is applied to the negroes born in the island. I have seen, and now have before me, a document, dated 26th June, 1839, purporting to be signed by Ezpeleta, who is captain general of the island, to identify which, I have put my name to the lefthand corner of the document, in presence of the counsel of the Africans; this document, or "trasspasso," purporting to be a permit granted to Don I. Ruiz, to export from Havana to Porto Principe, forty-nine negroes, designated by Spanish names, and called therein ladinos, a term totally inapplicable to newly imported Africans. I have seen, and now have before me, another document, dated 22d June, 1839, and signed in the same manner, granted to Don Pedro Montez, for the removal of three negro children from Havana to Porto Principe, also designated by Spanish names, and likewise called 'ladinos,' and wholly inapplicable to young African children, who could not have been acclimated, and long settled in the island; which document, I have identified in the same manner as the former. To have obtained these documents from the governor, for bona fide Bozal negroes, and have described them in the application for it, as ladinos, was evidently a fraud, but nothing more than such an application and the payment of the necessary fees would be required to procure it, as there is never any inquiry or inspection of the negroes on the part of the governor or his officers, nor is there any oath required from the applicant. I further state, that the above documents are manifestly inapplicable to the Africans of the Amistad, I have seen here and in New Haven; but such documents are commonly obtained by similar applications at the Havana, and by these means, the negroes recently and illegally introduced, are thus removed to the different ports of the island, and the danger obviated of their falling in with English cruisers, and then they are illegally carried into slavery. One of the largest dealers and importers of the island of Cuba, in African slaves, is the notorious house of Martiner & Co., of Havana; and for years past, as at present, they have

been deeply engaged in this traffic; and the Bozal Africans, imported by these and all other slave traders, when brought to the Havana, are immediately taken to the barracoons, or slave marts; five of which are situated in the immediate vicinity of the governor's county house, about one mile and a half from the walls of Havana; and from these barracoons, they are taken and removed to the different parts of the island when sold; and having examined the endorsements on the back of the trasspasso, or permits for the removal of the said negroes of the Amistad, the signature to that endorsement appears to be that of Martiner & Co.; and the document purports to be a permit or pass for the removal of the said negroes. The handwriting of Martiner & Co., I am not acquainted with. These barracoons, outside the city walls, are fitted up exclusively for the reception and sale of Bozal negroes; one of these barracoons or slave marts, called la miserecordia, or 'mercy,' kept by a man, named 'Riera,' I visited the 24th September last, in company with a person well acquainted with this establishment; and the factor or major domo of the master, in the absence of the latter, said to me, that the negroes of the Amistad had been purchased there; that he knew them well; that they had been bought by a man from Porto Principe, and had been embarked for that place; and speaking of the said negroes, he said, 'che, castima,' or what pity it is, which rather surprised me; the man further explained himself, and said, his regret was for the loss of so many valuable Bozals, in the event of their being executed in the United States.

"One of the houses most openly engaged, and notoriously implicated in the slave trade transactions, is that of Martiner & Co.; and their practice is to remove their newly arrived negroes from the slave ships to these barracoons, where they commonly remain two or three weeks before sold, as these negroes of the Amistad, illegally introduced by Martiner & Co., were in the present instance, as is generally reported and believed in the Havana. Of the Africans which I have seen and examined, from the necessity which my office imposes on me at the Havana of assisting at the registry of the newly imported, Bozals, emancipated by the Mixed Court, I can speak with tolerable certainty of the ages of these people, with the exce ion of the children, whom

I have not seen. Sa, about 17; Ba, 21 ; Luckawa, 19; Tussi, 30; Beli, 18; Shuma, 26; Nama, 20; Tenquis, 21; the others, I had not time to take a note of their ages.

"With respect to the Mixed Commission, its jurisdiction extends only to cases of captured negroes brought in by British or Spanish cruisers; and notwithstanding the illegalities of the traffic in slaves, from twenty to twenty-five thousand slaves have been introduced into the island during the last three years; and such is the state of society, and of the administration of the laws there, that hopeless slavery is the inevitable result of their removal into the interior."

On his cross-examination the witness stated, that he was not acquainted with the dialects of the African tribes, but was slightly acquainted with the Arabic language. Lawful slaves of the island are not offered for sale generally, or often placed in the barracoons, or man marts. The practice in Havana is to use the barracoons "for Bozal negroes only." Barracoons are used for negroes recently imported, and for their reception and sale. The native language of the Africans is not often continued for a long time on certain plantations. "It has been to me a matter of astonishment at the shortness of time in which the language of the negroes is disused, and the Spanish language adopted and acquired. I speak this, from a very intimate knowledge of the condition of the negroes in Cuba, from frequent visits to plantations, and journeys in the interior; and, on this subject, I think I can say my knowledge is as full as any person's can be.

"There are five or six barracoons within pistol shot of the country residence of the Captain General of Cuba. On every other part of the coast where the slave trade is carried on, a barracoon or barracoons must likewise exist. They are a part of the things necessary to the slave trade, and are for its use only; for instance, near Matanzas there is a building or shed of this kind and used for this purpose.

"Any negroes landed in the island since 1820, and carried into slavery, have been illegally introduced; and the transfer of them under false names, such as calling Bozal, Ladinos, is, necessarily, a fraud. Unfortunately, there is no interference on the part of the local authorities; they connive at it, and collude with the slave traders; the governor, alone, at the Havana, receiving a

bounty or impost on each negro thus illegally introduced, of ten dollars a head.   As to the Mixed Commission, once the negroes clandestinely introduced are landed they no longer have cognisance of the violation of the treaty; the governor has cognisance of this and every other bearing of the Spanish law on Spanish soil.   This head-money has not the sanction of any Spanish law for its imposition; and the proof of this is, it is called a voluntary contribution."

Also a statement, given by the District Attorney, W. S. Hola-bird, Esq., of what was made to him by A. G. Vega, Esq., Spanish Consul, January 10th, 1840: "That he is a Spanish subject; that he resided in the island of Cuba several years; that he knows the laws of that island on the subject of slavery; that there was no law that was considered in force in the island of Cuba, that prohibited the bringing in African slaves; that the Court of Mixed Commissioners had no jurisdiction except in cases of capture on the sea; that newly imported African negroes were constantly brought to the island, and, after landing, were bona fide transferred from one owner to another, without any interference by the local authorities or the Mixed Commission, and were held by the owners, and recognised as lawful property; that slavery was recognised in Cuba by all the laws that were considered in force there; that the native language of the slaves was kept up on some plantations for years.   That the barracoons are public markets, where all descriptions of slaves are sold and bought; that the papers of the Amistad are genuine, and are in the usual form; that it was not necessary to practise any fraud to obtain such papers from the proper officers of the government; that none of the papers of the Amistad are signed by Martiner, spoken of by R. R. Madden in his deposition; that he (Martiner) did not hold the office from whence that paper issued."

Also a deposition of James Ray, a mariner on board of the Washington, stating the circumstances of the taking possession of the Amistad, and the Africans, which supported the allegations in the several libels, in all essential circumstances.

The documents exhibited as the passports of the Spanish authorities at Havana, and other papers relating to the Amistad, and her clearance from Havana, were also annexed to the decree of the Circuit Court, in the original Spanish. Translations of all

of these, which were deemed of importance in the cause, are given in the decree of the District Court.

Sullivan Haley stated in his deposition, that he heard Ruiz say, that "none of the negroes could speak Spanish; they are just from Africa."

James Covey, a coloured man, deposed that "he was born at Berong-Mendi country; left there seven and a half years ago; was a slave, and carried to Lumboko. All these Africans were from Africa. Never saw them until now. I could talk with them. They appeared glad because they could speak the same language. I could understand all but two or three. They say they from Lumboke; three moons. They all have Mendi names, and their names all mean something; Carle, means bone; Kimbo, means cricket. They speak of rivers which I know; said they sailed from Lumboko; two or three speak different language from the others; the Timone language. Say-ang-wa rivers spoken of; these run through the Vi country. I learned to speak English at Sierre Leone. Was put on board a man-of-war one year and a half. They all agree as to where they sailed from. I have no doubt they are Africans. I have been in this country six months; came in a British man-of-war; have been in this town (New Haven) four months with Mr. Bishop; he calls on me for no money, and do not know who pays my board. I was stolen by a black man who stole ten of us. One man carried us two months' walk. Have conversed with Sinqua; Barton has been in my town, Gorang. I was sailing for Havana when the British man-of-war captured us."

The testimony of Cinque and the negroes of the Amistad, supported the statements in their answers.

The respondents also gave in evidence the "Treaty between Great Britain and Spain, for the abolition of the slave trade, signed at Madrid, 23d September, 1817."

The case was argued for the United States, by Mr. Gilpin, the Attorney General, and by Mr. Baldwin and Mr. Adams, for the appellees; Mr. Jones, on the part of Lieutenant Gedney and others, of the United States brig Washington, was not required by the Court to argue the claims to salvage.

Mr. Gilpin, the Attorney General, for the United States, reviewed the evidence, as set out in the record, of all the facts connected with the case, from the first clearance of the schooner Amistad, at Havana, on the 18th May, 1838, down to the 23d January, 1840, when the final decree of the District Court of the United States, for the District of Connecticut, was rendered.

The Attorney General proceeded to remark, that, on the 23d January, 1840, the case stood thus. The vessel, cargo, and negroes, were in possession of the Marshal, under process from the District Court, to answer to five separate claims; those of Lieutenant Gedney, and Messrs. Green and Fordham, for salvage; that of the United States, at the instance of the Spanish minister, for the vessel, cargo, and negroes, to be restored to the Spanish owners, in which claim those of Messrs. Ruiz and Montez were merged; that of the Spanish vice-consul, for the slave Antonio, to be restored to the Spanish owner; and that of Messrs. Tellincas, and Aspe and Laca, for the restoration of a part of the cargo belonging to them. The decree of the District Court found that the vessel, and the goods on board were the property of Spanish subjects, and that the passports under which the negroes were shipped at Havana, were signed by the Governor General of Cuba. It denied the claims of Lieutenant Gedney, and Messrs. Green and Fordham, to salvage on the slaves, but allowed the claims of the officers and crew of the Washington to salvage on the Amistad, and on the merchandise on board of that vessel. It also decreed that the residue of the goods, and the vessel, should be delivered to the Spanish minister, to be restored to the Spanish owners; and that the slave Antonio should be delivered to the Spanish vice-consul, for the same purpose. As to the negroes, claimed by Ruiz and Montez, it dismissed the claims of those persons, on the ground that they were included under that of the minister of Spain. The libel of the United States, claiming the delivery of the negroes to the Spanish minister, was dismissed, on the ground that they were not slaves, but were kidnapped and imported into Cuba; and that, at the time they were so imported, there was a law of Spain declaring persons so imported to be free. The alternative prayer of the United States, claiming the delivery of the negroes to be transported to Africa, was granted.

As soon as this decree was made, an appeal was taken by the

United States to the Circuit Court, from the whole of it, except so far as it related to Antonio. At the succeeding term of the Circuit Court, the negroes moved that the appeal of the United States might be dismissed, on the ground that they had no interest in the negroes; and, also, on the ground that they have no right to prosecute claims to property in behalf of subjects of the Queen of Spain. That motion, however, was refused by the Circuit Court, which proceeded to affirm the decree of the District Court, on the libel of the United States. It is from this decree of the Circuit Court that the present appeal to the Supreme Court is prosecuted.

Was the decree of the Circuit Court correct?

The state of the facts, as found by the decree, and not denied, was this. The vessel, and the goods on board, were the property of Spanish subjects in Havana, on the 27th June, 1839. At that time slavery was recognised and in existence in the Spanish dominions. The negroes in question are certified at that time, in a document signed by the Governor General of Cuba, to be ladinos negroes—that is, slaves—the property of Spanish subjects. As such, permission is given by the Governor General, to their owners, to take them, by sea, to Puerto Principe, in the same island. The vessel with these slaves, thus certified, on board, and in charge of their alleged owners, regularly cleared and sailed from Havana, the documentary evidence aforesaid, and the papers of the vessel being also on board. During this voyage, the negroes rose, killed the captain, and took possession of the vessel. On the 26th August, the vessel, cargo, and negroes, were rescued and taken on the high seas, by a public officer of the United States, and brought into a port of the United States, where they await the decision of the judicial tribunals.

In this position of things, the minister of Spain demands that the vessel, cargo, and negroes, be restored, pursuant to the 9th article of the treaty of 27th October, 1795, which provides (1 Laws of the United States, 268) that " all ships and merchandise of what nature soever, which shall be rescued out of the hands of any pirates or robbers, on the high seas, shall be brought into some port of either state, and shall be delivered into the custody of the officers of that port, in order to be taken care of and restored entire to the true proprietor, as soon as due

and sufficient proof shall be made concerning the property thereof."

The only inquiries, then, that present themselves, are,

1. Has "due and sufficient proof concerning the property thereof?" been made?

2. If so, have the United States a right to interpose in the manner they have done, to obtain its restoration to the Spanish owners?

. If these inquiries result in the affirmative, then the decree of the Circuit Court was erroneous, and ought to be reversed.

I. It is submitted that there has been due and sufficient proof concerning the property to authorize its restoration.

It is not denied that, under the laws of Spain, negroes may be held as slaves, as completely as they are in any of the states of this Union; nor will it be denied, if duly proved to be such, they are subject to restoration as much as other property, when coming under the provisions of this treaty. Now these negroes are declared, by the certificates of the Governor General, to be slaves, and the property of the Spanish subjects therein named. That officer (1 White's New Rec. 369, 371; 8 Peters, 310) is the highest functionary of the government in Cuba; his public acts are the highest evidence of any facts stated by him, within the scope of his authority. It is within the scope of his authority to declare what is property, and what are the rights of the subjects of Spain, within his jurisdiction, in regard to property.

Now, in the intercourse of nations, there is no rule better established than this, that full faith is to be given to such acts —to the authentic evidence of such acts. The question is not whether the act is right or wrong; it is, whether the act has been done, and whether it is an act within the scope of the authority. We are to inquire only whether the power existed, and whether it was exercised, and how it was exercised; not whether it was rightly or wrongly exercised.

The principle is universally admitted, that, wherever an author ity is delegated to any public officer, to be exercised at his discretion, under his own judgment and upon his own responsibility, the acts done in the appropriate exercise of that authority, are binding as to the subject matter. Without such a rule there could be no peace or comity among nations; all harmony, all mutual

respect would be destroyed; the Courts and tribunals of one country would become the judges of the local laws and property of others. Nor is it to be supposed that so important a principle would not be recognised by Courts of justice. They have held, that, whether the act of the foreign functionary be executive, legislative, or judicial, it is, if exercised within its appropriate sphere, binding as to the subject-matter; and the authentic record of such act is full and complete evidence thereof. In the case of Marbury v. Madison, 1 Cranch, 170, this Court held, that a commission was conclusive evidence of an executive appointment; and that a party from whom it was withheld might obtain it through the process of a Court, as being such evidence of his rights. In the case of Thompson v. Tolmie, 2 Peters, 167, this Court sustained the binding and sufficient character of a decision, made by a competent tribunal, and not reversed, whether that decision was in itself right or wrong. In the case of The United States v. Arredondo, 6 Peters, 719, the whole doctrine on this subject is most forcibly stated. Indeed, nothing can be clearer than the principles thus laid down; nor can they apply more directly to any case than the present. Here is the authentic certificate or record of the highest officer known to the Spanish law, declaring, in terms, that these negroes are the property of the several Spanish subjects. We have it countersigned by another of the principal officers. We have it executed and delivered, as the express evidence of property, to these persons. It is exactly the same as that deemed sufficient for the vessel and for the cargo. Would it not have been complete and positive evidence in the island of Cuba? If so, the principle laid down by this Court makes it such here.

But this general principle is strengthened by the particular circumstances of the case. Where property on board of a vessel is brought into a foreign port, the documentary evidence, whether it be a judicial decree, or the ship's papers, accompanied by possession, is the best evidence of ownership, and that to which Courts of justice invariably look. In the case of Bernardi v. Motteux, Douglas, 575, Lord Mansfield laid down the rule that a decree of a foreign Court was conclusive as to the right of property under it. In that of the Vigilantia, 1 Rob. 3. 11, the necessity or propriety of producing the ship's papers, as the first

evidence of her character and property, and of ascertaining her national character from her passport, is expressly recognised. In that of the Cosmopolite, 3 Rob. 269, the title of the claimant, who was a Dane, to the vessel, was a decree of a French Court against an American vessel; the Court refused to inquire into the circumstances of the condemnation, but held the decree sufficient evidence for them. In that of the Sarah, 3 Rob. 166, the captors of a prize applied to be allowed to give proof of the property being owned by persons other than those stated in the ship's documents, but it was refused. In that of the Henrich and Maria, 4 Rob. 52, the very question was made, whether the Court would not look into the validity of a title, derived under a foreign Court of Admiralty, and it was refused.

These principles are fully sustained by our own Courts.

In the case of the Resolution, 2 Dall. 22, 23, possession of property on board of a vessel is held to be presumptive evidence of ownership; and the ship's papers, bills of lading, and other documents, are prima facie evidence of the facts they speak. It is on this evidence that vessels are generally acquitted or condemned. In that of the Ann Green, 1 Gall. 281, 284, it is laid down as the rule that the first and proper evidence in prize cases is the ship's papers; and that only in cases of doubt is further testimony to be received. The Court there say that as a general rule they would pronounce for the inadmissibility of such further evidence. So in that of the Diana, 2 Gall. 97, the general rule laid down is, that no claim is to be admitted in opposition to the ship's papers; the exceptions stand upon very particular grounds. In that of Ohl *v*. The Eagle Insurance Company, 4 Mason, 172, parol evidence was held not to be admissible to contradict a ship's papers. In that of M'Grath *v*. Candelero, Bee, 60, a decree of restitution in a foreign Court of Admiralty was held to be full evidence of the ownership, and such as was to be respected in all other countries. In that of Catlett *v*. The Pacific Insurance Company, Paine, 612, the register was held to be conclusive evidence of the national character of the vessel; and a similar rule was held to exist in regard to a pass, in the case of Barker *v*. The Phœnix Insurance Company.

Similar principles have been adopted in this Court.

The decree of a foreign Court of Admiralty, on a question of blockade, was allowed in the case of Croudson *v.* Leonard, 4 Cranch, 434, to be contradicted in the Court below; but this Court reversed that decision, and held it to be conclusive. In that of the Mary, 9 Cranch, 142, this Court sustained the proof of property founded on the register against a decree of a foreign Court of Admiralty. In that of the Pizarro, 2 Wheaton, 227, the Court look to the documentary evidence, as that to be relied on to prove ownership; and although the papers were not strictly correct, they still relied on them in preference to further extraneous proof. Add to all this the twelfth article of the treaty with Spain, (1 Laws of United States, 270,) which makes passports and certificates evidence of property; and the principle may be regarded as established beyond a question, that the regular documents are the best and primary evidence in regard to all property on board of vessels. This is indeed especially the case when they are merely coasting vessels, or such as are brought in on account of distress, shipwreck, or other accident. The injustice of requiring further evidence in such cases, is too apparent to need any argument on the subject. Nor is it a less settled rule of international law, that when a vessel puts in by reason of distress or any similar cause, she is not to be judged by the municipal law. The unjust results to which a different rule would lead are most apparent. Could we tolerate it, that if one of our own coasters was obliged to put into Cuba, and had regular coasting papers, the Courts of that country should look beyond them, as to proof of property?

If this point be established, is there any difference between property in slaves and other property? They existed as property at the time of the treaty in perhaps every nation of the globe; they still exist as property in Spain and the United States; they can be demanded as property in the states of this Union to which they fly, and where by the laws they would not, if domiciliated, be property. If, then, they are property, the rules laid down in regard to property extend to them. If they are found on board of a vessel, the evidence of property should be that which is recognised as the best in other cases of property—the vessel's papers, accompanied by possession. In the case of the Louis,

2 Dodson, 238, slaves are treated of, by Sir William Scott, in express terms, as property, and he directed that those taken unlawfully from a foreigner should be restored:

In the case of the Antelope, 10 Wheaton, 119, the decision in the case of the Louis is recognised, and the same principle was fully and completely acted upon. It was there conceded, (10 Wheaton, 124,) that possession on board of a vessel was evidence of property. In the case of Johnson v. Tompkins, 1 Baldwin, 577, it was held that, even where it was a question of freedom or slavery, the same rules of evidence prevailed as in other cases relative to the right of property. In the case of Choat v. Wright, 2 Devereux, 289, a sale of a slave accompanied by delivery is valid, though there be no bill of sale. And it is well settled, that a title to them is vested by the statute of limitations, as in other cases of property. 5 Cranch, 358. 361. 11 Wheaton, 361.

If, then, the same law exists in regard to property in slaves as in other things; and if documentary evidence, from the highest authority of the country where the property belonged, accompanied with possession, is produced; it follows that the title to the ownership of this property is as complete as is required by law.

But it is said that this evidence is insufficient, because it is in point of fact fraudulent and untrue. The ground of this assertion is, that the slaves were not property in Cuba, at the date of the document signed by the Governor General; because they had been lately introduced into that island from Africa, and persons so introduced were free. To this it is answered that, if it were so, this Court will not look beyond the authentic evidence under the official certificate of the Governor General; that, if it would, there is not such evidence as this Court can regard to be sufficient to overthrow the positive statement of that document; and that, if the evidence were even deemed sufficient to show the recent introduction of the negroes, it does not establish that they were free at the date of the certificate.

, I. This Court will not look behind the certificate of the Governor-General. It does not appear to be alleged that it is fraudulent in itself. It is found by the District Court to have been signed by him, and countersigned by the officer of the customs.

It was issued by them in the appropriate exercise of their functions. It resembles an American register or coasting license. Now, all the authorities that have been cited show that these documents are received as the highest species of evidence, and that, even if there is error in the proceedings on which they are founded. The correction must be made by the tribunal from which it emanates. Where should we stop if we were to refuse to give faith to the documents of public officers? All national intercourse, all commerce must be at an end. If there is error in issuing these papers, the matter must be sent to the tribunals of Spain for correction.

II. But if this Court will look behind this paper; is the evidence sufficient to contradict it? The official declaration, to be contradicted is certainly of a character not to be lightly set aside in the Courts of a foreign country. The question is not as to the impression we may derive from the evidence; but how far is it sufficient to justify us in declaring a fact in direct contradiction to such an official declaration. It is not evidence that could be received according to the established admiralty practice. Seamen (1 Peters, Ad. Dec. 211) on board of a vessel cannot be witnesses for one another in matters where they have a common interest. Again, the principal part of this evidence is not taken under oath. That of Dr. Madden, which is mainly relied upon, is chiefly hearsay; and is contradicted, in some of its most essential particulars, by that of other witnesses.

Would this Court be justified, on evidence such as this, in setting aside the admitted certificate of the Governor General? Would such evidence, in one of our own Courts, be deemed adequate to set aside a judicial proceeding, or an act of a public functionary, done in the due exercise of his office? How, then, can it be adequate to such an end, before the tribunals of a foreign country, when they pass upon the internal municipal acts of another government; and when the endeavour is made to set them aside, in a matter relating to their own property and people?

III. But admit this evidence to be competent and sufficient; admit these negroes were brought into Cuba a few weeks before the certificate was given; still, were they not slaves, under the Spanish laws? It is not denied that negroes imported from

Africa into Cuba, might be slaves. If they are not, it is on account of some special law or decree. Has such a law been produced in the present case? The first document produced is the treaty with England, of 23d September, 1817. But that has no such effect. It promises, indeed, that Spain will take into consideration the means of preventing the slave trade, and it points out those means, so far as the trade on the coast of Africa is concerned. But it carefully limits the ascertainment of any infringement to two special tribunals; one at Sierra Leone, and the other at Havana. The next is the decree of December, 1817, which authorizes negroes, brought in against the treaty, to " be declared free." The treaty of 28th June, 1835, which is next adduced, is confined entirely to the slave trade on the coast of Africa, or the voyage from there. Now, it is evident that none of these documents show that these negroes were free in Cuba. They had not been " declared free" by any competent tribunal. Even had they been taken actually on board of a vessel engaged in the slave trade, they must have been adjudicated upon at one of the two special courts, and nowhere else. Can this Court, then, undertake to decide this question of property, when it has not even been decided by the Spanish Courts; and make such decision in the face of the certificate of the highest functionary of the island?

It is submitted, then, that if this Court does go behind the certificate of the Governor General, and look into the fact, whether or not these persons were slaves on the 18th June, 1839, yet there is no sufficient evidence on which they could adjudge it to be untrue. If this be so, the proof concerning the property is sufficient to bring the case within the intention and provisions of the treaty.

The next question is, did the United States legally intervene to obtain the decree of the Court for the restoration of the property, in order that it might be delivered to the Spanish owners, according to the stipulations of the treaty? They did; because the property of foreigners, thus brought under the cognisance of the Courts, is, of right, deliverable to the public functionaries of the government to which such foreigners belong; because those functionaries have required the interposition of the United States on their behalf; and because the United States were au-

thorized, on that request, to interpose, pursuant to their treaty obligations.

That the property of foreigners, under such circumstances, may be delivered to the public functionaries, is so clearly esta-blished, by the decisions of this Court, that it is unnecessary to discuss the point. In the case (2 Mason, 411, 412. 463) of La Jeune Eugenie, there was a libel of the vessel, as in this case, and a claim interposed by the French consul, and also by the owners themselves. The Court there directed the delivery of the property to the public functionary. In that of the Divina Pas-tora, 4 Wheat. 52, the Spanish consul interposed. In that of the Antelope, 10 Wheat. 68, there were claims interposed, very much as in this case, by the captain as captor, and by the Vice Consuls of Spain and Portugal, for citizens of their respective countries; and by the United States. The Court directed their delivery, partly to the Consul of Spain, and partly to the United States. It is thus settled, that the public functionaries are enti-tled to intervene in such cases, on behalf of the citizens of their countries. In the present one, the Spanish minister did so inter-vene by applying to the United States to adopt, on his behalf, the necessary proceedings; and, upon his doing so, Ruiz and Montez withdrew their separate claims. The United States, on their part, acted as the treaty required. The executive is their agent in all such transactions, and on him devolved the obliga-tion to see this property restored entire, if due proof concerning it was made. The form of proceeding was already established by precedent and by law. The course adopted was exactly that pursued in the case of M'Fadden v. The Exchange, 7 Cranch, 116, where a vessel was libelled in a port of the United States. Being a public vessel of a foreign sovereign, which the govern-ment was bound to protect, they intervened exactly in the same way. The libel was dismissed, and the vessel restored to the custody of the public officers of France.

It is, therefore, equally clear, that the United States, in this in-stance, has pursued the course required by the laws of nations; and if the Court are satisfied, on the first point, that there is due proof concerning the property, then it ought to be delivered entire, so that it may be restored to the Spanish owners. If this be so, the Court below has erred, because it has not decreed any part of

the property to be delivered entire, except the boy Antonio. From the vessel and cargo, it has deducted the salvage, diminishing them by that amount; and the negroes it has entirely refused to direct to be delivered.

Mr. Baldwin, for the defendants in error.

In preparing to address this honourable Court, on the questions arising upon this record, in behalf of the humble Africans whom I represent,—contending, as they are, for freedom and for life, with two powerful governments arrayed against them,—it has been to me a source of high gratification, in this unequal contest, that those questions will be heard and decided by a tribunal, not only elevated far above the influence of executive power and popular prejudice, but, from its very constitution, exempt from liability to those imputations to which a Court, less happily constituted, or composed only of members from one section of the Union, might, however unjustly, be exposed.

This case is not only one of deep interest in itself, as affecting the destiny of the unfortunate Africans, whom I represent, but it involves considerations deeply affecting our national character in the eyes of the whole civilized world, as well as questions of power on the part of the government of the United States, which are regarded with anxiety and alarm by a large portion of our citizens. It presents, for the first time, the question whether that government, which was established for the promotion of JUSTICE, which was founded on the great principles of the Revolution, as proclaimed in the Declaration of Independence, can, consistently with the genius of our institutions, become a party to proceedings for the enslavement of human beings cast upon our shores, and found in the condition of freemen within the territorial limits of a FREE AND SOVEREIGN STATE?

In the remarks I shall have occasion to make, it will be my design to appeal to no sectional prejudices, and to assume no positions in which I shall not hope to be sustained by intelligent minds from the south as well as from the north. Although I am in favour of the broadest liberty of inquiry and discussion,— happily secured by our Constitution to every citizen, subject only to his individual responsibility to the laws for its abuse; I have ever been of the opinion that the exercise of that liberty by

citizens of one state, in regard to the institutions of another, should always be guided by discretion, and tempered with kindness.

Mr. Baldwin here proceeded to state all the facts of the case, and the proceedings in the District and Circuit Courts, in support of the motion to dismiss the appeal. As no decision was given by the Court on the motion, this part of the argument is, necessarily, omitted.

Mr. Baldwin continued: If the government of the United States could appear in any case as the representative of foreigners claiming property in the Court of Admiralty, it has no right to appear in their behalf to aid them in the recovery of fugitive slaves, even when domiciled in the country from which they escaped: much less the recent victims of the African slave trade, who have sought an asylum in one of the free states of the Union, without any wrongful act on our part, or for which, as in the case of the Antelope, we are in any way responsible.

The recently imported Africans of the Amistad, if they were ever slaves, which is denied, were in the actual condition of freedom when they came within the jurisdictional limits of the state of New York. They came there without any wrongful act on the part of any officer or citizen of the United States. They were in a state where, not only no law existed to make them slaves, but where, by an express statute, all persons, except fugitives, &c. from a sister state, are declared to be free. They were under the protection of the laws of a state, which, in the language of the Supreme Court, in the case of Miln *v.* The City of New York, 11 Peters, 139, "has the same undeniable and unlimited jurisdiction over all persons and things within its territorial limits, as any foreign nation, when that jurisdiction is not surrendered or restrained by the Constitution of the United States."

The American people have never imposed it as a duty on the government of the United States, to become actors in an attempt to reduce to slavery, men found in a state of freedom, by giving extra-territorial force to a foreign slave law. Such a duty would not only be repugnant to the feelings of a large portion of the citizens of the United States, but it would be wholly inconsistent with the fundamental principles of our government, and the pur-

[The United States *v.* The Amistad.]

poses for which it was established, as well as with its policy in prohibiting the slave trade and giving freedom to its victims.

The recovery of slaves for their owners, whether foreign or domestic, is a matter with which the executive of the United States has no concern. The Constitution confers upon the government no power to establish or legalize the institution of slavery. It recognises it as existing in regard to persons held to service by the laws of the states which tolerate it; and contains a compact between the states, obliging them to respect the rights acquired under the slave laws of other states, in the cases specified in the Constitution. But it imposes no duty, and confers no power on the government of the United States to act in regard to it. So far as the compact extends, the Courts of the United States, whether sitting in a free state or a slave state, will give effect to it. Beyond that, all persons within the limits of a state are entitled to the protection of its laws.

If these Africans have been taken from the possession of their Spanish claimants, and wrongfully brought into the United States by our citizens, a question would have been presented similar to that which existed in the case of the Antelope. But when men have come here voluntarily, without any wrong on the part of the government or citizens of the United States, in withdrawing them from the jurisdiction of the Spanish laws, why should this government be required to become active in their restoration? They appear here as freemen. They are in a state where they are presumed to be free. They stand before our Courts on equal ground with their claimants; and when the Courts, after an impartial hearing with all parties in interest before them, have pronounced them free, it is neither the duty nor the right of the executive of the United States, to interfere with the decision.

The question of the surrender of fugitive slaves to a foreign claimant, if the right exists at all, is left to the comity of the states which tolerate slavery. The government of the United States has nothing to do with it. In the letter of instructions addressed by Mr. Adams, when Secretary of State, to Messrs. Gallatin and Rush, dated November    1818, in relation to a proposed arrangement with Great Britain, for a more active co-operation in the suppression of the slave trade, he assigns as a

reason for rejecting the proposition for a mixed commission, " that the disposal of the negroes found on board the slave-trading vessels, which might be condemned by the sentence of the mixed Courts, cannot be carried into effect by the United States." " The condition of the blacks being in this Union regulated by the municipal laws of the separate states, the government of the United States can neither guarantee their liberty in the states where they could only be received as slaves, nor control them in the states where they would be recognised as free." Doc. 48, H. Rep. 2 sess. 16th Cong. p. 15.

It may comport with the interest or feelings of a slave state to surrender a fugitive slave to a foreigner, or at least to expel him from their borders. But the people of New England, except so far as they are bound by the compact, would cherish and protect him. To the extent of the compact we acknowledge our obligation, and have passed laws for its fulfilment. Beyond that our citizens would be unwilling to go.

A state has no power to surrender a fugitive criminal to a foreign government for punishment; because that is necessarily a matter of national concern. The fugitive is demanded for a national purpose. But the question of the surrender of fugitive slaves concerns individuals merely. They are demanded as property only, and for private purposes. It is, therefore, a proper subject for the action of the state, and not of the national authorities.

The surrender of neither is demandable of right, unless stipulated by treaty. See as to the surrender of fugitive criminals, 2 Brock. Rep. 493. 2 Sumner, 482. 14 Peters, 540. Doc. 199, H. R. 26 Cong. p. 53. 70. 10 Amer. State Pap. 151. 153. 433. 3 Hall's Law Jour. 135. An overture was once made by the government of the United States to negotiate a treaty with Great Britain for the mutual surrender of fugitive slaves. But it was instantly repelled by the British government. It may well be doubted whether such a stipulation is within the treaty-making power under the Constitution of the United States. " The power to make treaties," says Chief Justice Taney, 14 Peters, 569, " is given in general terms, . . . . and consequently it was designed to include all those subjects which in the ordinary intercourse of nations had usually been made subjects

of negotiation and treaty; and which are consistent with the nature of our institutions, and the distribution of powers between the general and state governments." See Holmes v. Jennison, 14 Peters, 569. But, however this may be, the attempt to introduce it is evidence that, unless provided for by treaty, the obligation to surrender was not deemed to exist

We deny that Ruiz and Montez, Spanish subjects, had a right to call on any officer or Court of the United States to use the force of the government, or the process of the law for the purpose of again enslaving those who have thus escaped from foreign slavery, and sought an asylum here. We deny that the seizure of these persons by Lieutenant Gedney for such a purpose was a legal or justifiable act.

How would it be—independently of the treaty between the United States and Spain—upon the principles of our government, of the common law, or of the law of nations?

If a foreign slave vessel, engaged in a traffic which by our laws is denounced as inhuman and piratical, should be captured by the slaves while on her voyage from Africa to Cuba, and they should succeed in reaching our shores, have the Constitution or laws of the United States imposed upon our judges, our naval officers, or our executive, the duty of seizing the unhappy fugitives and delivering them up to their oppressors? Did the people of the United States, whose government is based on the great principles of the Revolution, proclaimed in the Declaration of Independence, confer upon the federal executive, or judicial tribunals, the power of making our nation accessories to such atrocious violations of human right?

Is there any principle of international law, or law of comity which requires it? Are our Courts bound, and if not, are they at liberty, to give effect here to the slave trade laws of a foreign nation; to laws affecting strangers, never domiciled there, when, to give them such effect would be to violate the natural rights of men?

These questions are answered in the negative by all the most approved writers on the laws of nations. 1 Burg. Confl. 741. Story, Confl. 92.

By the law of France, the slaves of their colonies, immediately on their arrival in France, become free. In the case of

Forbes *v.* Cochrane, 2 Barn. and Cress. 463, this question is ela-
borately discussed and settled by the English Court of King's
Bench.

By the law of the state of New York, a foreign slave escaping
into that state becomes free. And the Courts of the United
States, in acting upon the personal rights of men found within
the jurisdiction of a free state, are bound to administer the laws
as they would be administered by the state Courts, in all cases
in which the laws of the state do not conflict with the laws or
obligations of the United States. The United States as a nation
have prohibited the slave trade as inhuman and piratical, and
they have no law authorizing the enslaving of its victims. It is
a maxim, to use the words of an eminent English judge, in the
case of Forbes *v.* Cochrane, 2 Barn. and Cress., "that which is
called comitas inter communitates, cannot prevail in any case,
where it violates the law of our own country, the law of nature,
or the law of God." 9 Eng. C. L. R. 149. And that the laws
of a nation, proprio vigore, have no force beyond its own territo-
ries, except so far as it respects its own citizens, who owe it alle-
giance, is too familiarly settled to need the citation of authorities.
See 9 Wheaton, 366. Apollon, 2 Mason, 151—158. The rules on
this subject adopted in the English Court of Admiralty are the
same which prevail in their Courts of common law, though they
have decided in the case of The Louis, 2 Dodson, 238, as the
Supreme Court did in the case of the Antelope, 10 Wheaton, 66,
that as the slave trade was not, at that time, prohibited by the
law of nations, if a foreign slaver was captured by an English
ship, it was a wrongful act, which it would be the duty of the
Court of Admiralty to repair by restoring the possession. The
principle of amoveas manus, adopted in these cases, has no ap-
plication to the case of fugitives from slavery.

But it is claimed that if these Africans, though "recently im-
ported into Cuba," were by the laws of Spain the property of Ruiz
and Montez, the government of the United States is bound by the
treaty to restore them; and that, therefore, the intervention of
the executive in these proceedings is proper for that purpose.
It has already, it is believed, been shown that even if the case
were within the treaty, the intervention of the executive as a
party before the judicial tribunals was unnecessary and impro-

per, since the treaty provides for its own execution by the Courts, on the application of the parties in interest. And such a resort is expressly provided in the twentieth article of the treaty of 1794 with Great Britain, and in the twenty-sixth article of the treaty of 1801 with the French Republic, both of which are in other respects similar to the ninth article of the Spanish treaty, on which the Attorney General has principally relied.

The sixth article of the Spanish treaty has received a judicial construction in the case of the Santissima Trinidad, 7 Wheaton, 284, where it was decided that the obligation assumed is simply that of protecting belligerent vessels from capture within our jurisdiction. It can have no application therefore to a case like the present.

The ninth article of that treaty provides "that all ships and merchandise of what nature soever, which shall be rescued out of the hands of pirates or robbers, on the high seas, shall be brought into some port of either state, and shall be delivered to the custody of the officers of that port, in order to be taken care of, and restored entire to the true proprietors, as soon as due and sufficient proof shall be made concerning the property thereof."

To render this clause of the treaty applicable to the case under consideration, it must be assumed that under the term "merchandise" the contracting parties intended to include slaves; and that slaves, themselves the recent victims of piracy, who, by a successful revolt, have achieved their deliverance from slavery, on the high seas, and have availed themselves of the means of escape of which they have thus acquired the possession, are to be deemed "pirates and robbers," "from whose hands" such "merchandise has been rescued."

It is believed that such a construction of the words of the treaty is not in accordance with the rules of interpretation which ought to govern our Courts; and that when there is no special reference to human beings as property, who are not acknowledged as such by the law or comity of nations generally, but only by the municipal laws of the particular nations which tolerate slavery, it cannot be presumed that the contracting parties intended to include them under the general term "merchandise." As has already been remarked, it may well be doubted

whether such a stipulation would be within the treaty-making power of the United States. It is to be remembered that the government of the United States is based on the principles promulgated in the Declaration of Independence by the Congress of 1776; "that all men are created equal; that they are endowed by their Creator with certain inalienable rights; that among these are life, liberty, and the pursuit of happiness; and that to secure these rights governments are instituted."

The convention which formed the Federal Constitution, though they recognised slavery as existing in regard to persons held to labour by the laws of the states which tolerated it, were careful to exclude from that instrument every expression that might be construed into an admission that there could be property in men. It appears by the report of the proceedings of the convention, (3 Madison Papers, 1428,) that the first clause of section 9, article 1, which provides for the imposition of a tax or duty on the importation of such persons as any of the states, then existing, might think proper to admit, &c., "not exceeding ten dollars for each person," was adopted in its present form, in consequence of the opposition by Roger Sherman and James Madison to the clause as it was originally reported, on the ground, "that it admitted that there could be property in men;" an idea which Mr. Madison said "he thought it wrong to admit in the Constitution." The words reported by the committee, and stricken out on this objection, were: "a tax or duty may be imposed on such migration or importation at a rate not exceeding the average of the duties laid upon imports." The Constitution as it now stands will be searched in vain for an expression recognising human beings as merchandise or legitimate subjects of commerce. In the case of New York v. Miln, 11 Peters, 104. 136, Judge Barbour, in giving the opinion of the Court, expressly declares, in reference to the power "to regulate commerce" conferred on Congress by the Constitution, that "persons are not the subjects of commerce." Judging from the public sentiment which prevailed at the time of the adoption of the Constitution, it is probable that the first act of the government in the exercise of its power to regulate commerce, would have been to prohibit the slave trade, if it had not been restrained until 1808, from prohibiting the importation of such persons as any of the states,

then existing, should think proper to admit.   But could Congress have passed an act authorizing the importation of slaves as articles of commerce, into any state in opposition to a law of the state, prohibiting their introduction?   If they could, they may now force slavery into every state.   For no state can prohibit the introduction of legitimate objects of foreign commerce, when authorized by Congress.

The United States must be regarded as comprehending free states as well as slave states: states which do not recognise slaves as property, as well as states which do so regard them.   When all speak as a nation, general expressions ought to be construed to mean what all understand to be included in them; at all events, what may be included consistently with the law of nature.

The ninth article of the Spanish treaty was copied from the sixteenth article of the treaty with France, concluded in 1778, in the midst of the war of the Revolution, in which the great principles of liberty proclaimed in the Declaration of Independence were vindicated by our fathers.

By "merchandise rescued from pirates," the contracting parties must have had in view property, which it would be the duty of the public ships of the United States to rescue from its unlawful possessors.   Because, if it is taken from those who are rightfully in possession, the capture would be wrongful, and it would be our duty to restore it.   But is it a duty which our naval officers owe to a nation tolerating the slave trade, to subdue for their kidnappers the revolted victims of their cruelty?   Could the people of the United States, consistently with their principles as a nation, have ever consented to a treaty stipulation which would impose such a duty on our naval officers? a duty which would drive every citizen of a free state from the service of his country?   Has our government, which has been so cautious as not to oblige itself to surrender the most atrocious criminals, who have sought an asylum in the United States, bound itself, under the term "merchandise," to seize and surrender fugitive slaves?

The subject of the delivery of fugitives was under consideration before and during the negotiation of the Treaty of San Lorenzo; and was purposely omitted in the treaty.   Sec. 10 Waite's State Papers, 151. 433.   Our treaties with Tunis and Algiers contain similar expressions, in which both parties stipu-

3 A 2

late for the protection of the property of the subjects of each within the jurisdiction of the other.   The Algerine regarded his Span: h captive as property; but was it ever supposed, that if an Algerine corsair should be seized by the captive slaves on board of her, it would be the duty of our naval officers, or our Courts of Admiralty, to recapture and restore them?

The phraseology of the entire article in the treaty, clearly shows that it was intended to apply only to inanimate things, or irrational animals; such as are universally regarded as property. It is "merchandise rescued from the hands of pirates and robbers on the high seas" that is to be restored.   There is no provision for the surrender of the pirates themselves.   And the reason is, because the article has reference only to those who are "hostes humani generis," whom it is lawful for, and the duty of all nations to capture and to punish.  If these Africans were "pirates" or sea robbers, whom our naval officers might lawfully seize, it would be our duty to detain them for punishment; and then what would become of the "merchandise?"

But they were not pirates, nor in any sense hostes humani generis.  Cinque, the master-spirit who guided them, had a single object in view.   That object was—not piracy or robbery—but the deliverance of himself and his companions in suffering, from unlawful bondage.   They owed no allegiance to Spain. They were on board of the Amistad by constraint.  Their object was to free themselves from the fetters that bound them, in order that they might return to their kindred and their home.   In so doing they were guilty of no crime, for which they could be held responsible as pirates.   See Bee's Rep. 273.   Suppose they had been impressed American seamen, who had regained their liberty in a similar manner, would they in that case have been deemed guilty of piracy and murder?   Not in the opinion of Chief Justice Marshall.   In his celebrated speech in justification of the surrender by President Adams of Nash under the British treaty, he says: "Had Thomas Nash been an impressed American, the homicide on board the Hermione would most certainly not have been murder.   The act of impressing an American is an act of lawless violence.   The confinement on board a vessel is a continuation of that violence, and an additional outrage.   Death

committed within the United States in resisting such violence, would not have been murder." Bee's Rep. 290.

The United States, as a nation, is to be regarded as a free state. And all men being presumptively free, when "merchandise" is spoken of in the treaty of a free state, it cannot be presumed that human beings are intended to be included as such. Hence, whenever our government have intended to speak of negroes as property, in their treaties, they have been specifically mentioned, as in the treaties with Great Britain, of 1783 and 1814. It was on the same principle, that Judge Drayton, of South Carolina, decided, in the case of Almeida, who had captured, during the last war, an English vessel with slaves, that the word "property" in the prize act, did not include negroes, and that they must be regarded as prisoners of war, and not sold or distributed merchandise.   5 Hall's Law Journal, 459.

And it was for the same reason, that it was deemed necessary in the Constitution, to insert an express stipulation in regard to fugitives from service.   The law of comity would have obliged each state to protect and restore property belonging to a citizen of another, without such stipulation; but it would not have required the restoration of fugitive slaves from a sister state, unless they had been expressly mentioned.

In the interpretation of treaties we ought always to give such a construction to the words as is most consistent with the customary use of language; most suitable to the subject, and to the legitimate powers of the contracting parties; most conformable to the declared principles of the government; such a construction as will not lead to injustice to others, or in any way violate the laws of nature.

These are, in substance, the rules of interpretation as given by Vattel, b. ii. ch. 17.   The construction claimed in behalf of the Spanish libellants, in the present case, is at war with them all.

It would be singular, indeed, if the tribunals of a government which has declared the slave-trade piracy, and has bound itself by a solemn treaty with Great Britain, in 1814, to make continued efforts " to promote its entire abolition, as a traffic irreconcilable with the principles of humanity and justice," should construe the general expressions of a treaty which since that period

has been revised by the contracting parties, as obliging this nation to commit the injustice of treating as property the recent victims of this horrid traffic ; more especially when it is borne in mind, that the government of Spain, anterior to the revision of the treaty in 1819, had formally notified our government that Africans were no longer the legitimate objects of trade ; with a declaration that " His majesty felt confident that a measure so completely in harmony with the sentiments of this government, and of all the inhabitants of this republic, could not fail to be equally agreeable to the President." Doc. 48. 2 sess. 16 Cong. p. 8.

Would the people of the United States, in 1819, have assented to such a treaty ? Would it not have furnished just ground of complaint by Great Britain, as a violation of the 10th article of the treaty of Ghent ?

But even if the treaty in its terms were such as to oblige us to violate towards strangers the immutable laws of justice, it would, according to Vattel, impose no obligation. Vattel, c. 1, § 9 ; b. ii. c. 12, § 161 ; c. 17, § 311.

The law of nature and the law of nations, bind us as effectually to render justice to the African, as the treaty can to the Spaniard. Before a foreign tribunal, the parties litigating the question of freedom or slavery, stand on equal ground. And in a case like this, where it is admitted that the Africans were recently imported, and consequently never domiciled in Cuba, and owe no allegiance to its laws, their rights are to be determined by that law which is of universal obligation—the law of nature.

If, indeed, the vessel in which they sailed had been driven upon our coast by stress of weather or other unavoidable cause, and they had arrived here in the actual possession of their alleged owners, and had been slaves by the law of the country from which they sailed, and where they were domiciled, it would have been a very different question, whether the Courts of the United States could interfere to liberate them, as was done at Bermuda by the colonial tribunal, in the case of the Enterprise.

But in this case there has been no possession of these Africans by their claimants within our jurisdiction, of which they have been deprived, by the act of our government or its officers ; and neither by the law of comity, or by force of the treaty, are the

officers or Courts of the United States required, or by the principles of our government permitted to become actors in reducing them to slavery.

These preliminary questions have been made on account of the important principles involved in them, and not from any unwillingness to meet the question between the Africans and their claimants upon the facts in evidence, and on those alone, to vindicate their claims to freedom.

Suppose, then, the case to be properly here : and that Ruiz and Montez, unprejudiced by the decree of the Court below, were at liberty to take issue with the Africans upon their answer, and to call upon this Court to determine the question of liberty or property, how stands the case on the evidence before the Court?

The Africans, when found by Lieutenant Gedney, were in a free state, where all men are presumed to be free, and were in the actual condition of freemen.   The burden of proof, therefore, rests on those who assert them to be slaves.   10 Wheaton, 66. 2 Mason, 459.   When they call on the Courts of the United States to reduce to slavery men who are apparently free, they must show some law, having force in the place where they were taken, which makes them slaves, or that the claimants are entitled in our Courts to have some foreign law, obligatory on the Africans as well as on the claimants, enforced in respect to them ; and that by such foreign law they are slaves.

It is not pretended that there was any law existing in the place where they were found, which made them slaves, but it is claimed that by the laws of Cuba they were slaves to Ruiz and Montez ; and that those laws are to be here enforced.   But before the laws of Cuba, if any such there be, can be applied to affect the personal status of individuals within a foreign jurisdiction, it is very clear that it must be shown that they were domiciled in Cuba.

It is admitted and proved in this case that these negroes are natives of Africa, and recently imported into Cuba.   Their domicil of origin is consequently the place of their birth in Africa. And the presumption of law is, always, that the domicil of origin, is retained until the change is proved.   1 Burge's Conflict. 34.

71

The burden of proving the change is cast on him who alleges it. 5 Vesey, 787.

The domicil of origin prevails until the party has not only acquired another, but has manifested and carried into execution an intention of abandoning his former domicil, and acquiring another, as his sole domicil. As it is the will or intention of the party which alone determines what is the real place of domicil which he has chosen, it follows that a former domicil is not abandoned by residence in another, if that residence be not voluntarily chosen. Those who are in exile, or in prison, as they are never presumed to have abandoned all hope of return, retain their former domicil. 1 Burg. 46. That these victims of fraud and piracy—husbands torn from their wives and families—children from their parents and kindred—neither intended to abandon the land of their nativity, nor had lost all hope of recovering it, sufficiently appears from the facts on this record. It cannot, surely, be claimed that a residence, under such circumstances, of these helpless beings for ten days in a slave barracoon, before they were transferred to the Amistad, changed their native domicil for that of Cuba.

It is not only incumbent on the claimants to prove that the Africans are domiciled in Cuba, and subject to its laws, but they must show that some law existed there by which " recently imported Africans" can be lawfully held in slavery. Such a law is not to be presumed, but the contrary. Comity would seem to require of us to presume that a traffic so abhorrent to the feelings of the whole civilized world is not lawful in Cuba. These respondents having been born free, and having been recently imported into Cuba, have a right to be everywhere regarded as free, until some law obligatory on them is produced authorizing their enslavement. Neither the law of nature nor the law of nations authorizes the slave-trade ; although it was holden in the case of the Antelope, that the law of nations did not at that time actually prohibit it. If they are slaves, then, it must be by some positive law of Spain, existing at the time of their recent importation. No such law is exhibited. On the contrary, it is proved by the deposition of Dr. Madden, one of the British commissioners resident at Havana, that since the year 1820, there has been no such law in force there, either statute or common law.

But we do not rest the case here.   We are willing to assume the burden of proof.   On the 14th of May, 1818, the Spanish government, by their minister, announced to the government of the United States that the slave-trade was prohibited by Spain; and by express command of the King of Spain, Don Onis communicated to the President of the United States the treaty with Great Britain of September 23d, 1817, by which the King of Spain, moved partly by motives of humanity, and partly in consideration of four hundred thousand pounds sterling, paid to him by the British government for the accomplishment of so desirable an object, engaged that the slave-trade should be abolished throughout the dominions of Spain, on the 30th May, 1820.   By the ordinance of the King of Spain of December, 1817, it is directed that every African imported into any of the colonies of Spain in violation of the treaty, shall be declared free in the first port at which he shall arrive.

By the treaty between Great Britain and Spain of the 28th of June, 1835, which is declared to be made for the purpose of "rendering the means taken for abolishing the inhuman traffic in slaves more effective," and to be in the spirit of the treaty contracted between both powers on the 23d of September, 1817, "the slave-trade is again declared on the part of Spain to be henceforward totally and finally abolished, in all parts of the world."   And by the royal ordinance of November 2d, 1838, the Governor and the naval officers having command on the coast of Cuba, are stimulated to greater vigilance to suppress it.

Such, then, being the laws in force in all the dominions of Spain, and such the conceded facts in regard to the nativity and recent importation of these Africans, upon what plausible ground can it be claimed by the government of the United States, that they were slaves in the island of Cuba, and are here to be treated as property, and not as human beings?

The only evidence exhibited to prove them slaves, are the papers of the Amistad; giving to Jose Ruiz permission to transport forty-nine Ladinos belonging to him, from Havana to Puerto Principe; and a like permit to Pedro Montez, to transport three Ladinos.   For one of the four Africans, claimed by Montez, (the boy Ka-le,) there is no permit at all.

It has been said in an official opinion by the late Attorney

General, (Mr. Grundy,) that "as this vessel cleared out from one Spanish port to another Spanish port, with papers regularly authenticated by the proper officers at Havana, evidencing that these negroes were slaves, and that the destination of the vessel was to another Spanish port, the government of the United States would not be authorized to go into an investigation for the purpose of ascertaining whether the facts stated in those papers by the Spanish officers are true or not;"—"that if it were to permit itself to go behind the papers of the schooner Amistad, it would place itself in the embarrassing condition of judging upon Spanish laws, their force, effect, and application to the case under consideration." In support of this opinion, a reference is made to the opinion of this Court, in the case of Arredondo, 6 Pet. 729, where it is stated to be "a universal principle, that where power or jurisdiction is delegated to any public officer or tribunal over a subject-matter, and its exercise is confided to his or their discretion, the acts so done are binding and valid as to the subject-matter; and individual rights will not be disturbed collaterally for any thing done in the exercise of that discretion within the authority conferred. The only questions which can arise between an individual claiming a right under the acts done, and the public, or any person denying its validity, are power in the officer, and fraud in the party."

The principle thus stated, was applicable to the case then before the Court, which related to the validity of a grant made by a public officer; but it does not tend to support the position for which it is cited in the present case. For, in the first place, there was no jurisdiction over these newly imported Africans, by the laws of Spain, to make them slaves, any more than if they had been white men. The ordinance of the king declared them free. Secondly, there was no intentional exercise of jurisdiction over them for such a purpose, by the officer who granted the permits; and, thirdly, the permits were fraudulently obtained, and fraudulently used by the parties claiming to take benefit of them. For the purposes for which they are attempted to be applied, the permits are as inoperative as would be a grant from a public officer, fraudulently obtained, where the state had no title to the thing granted, and the officer no authority to issue the grant. See 6 Peters, 730. 5 Wheat. 303

But it is said, we have no right to place ourselves in the position of judging upon the Spanish laws. How can our Courts do otherwise, when Spanish subjects call upon them to enforce rights which, if they exist at all, must exist by force of Spanish laws? For what purpose did the government of Spain communicate to the government of the United States, the fact of the prohibition of the slave-trade, unless it was that it might be known and acted upon by our Courts? Suppose the permits to Ruiz and Montez had been granted for the express purpose of consigning to perpetual slavery, these recent victims of this prohibited trade, could the government of Spain now ask the government or the Courts of the United States, to give validity to the acts of a colonial officer, in direct violation of that prohibition; and thus make us aiders and abettors in what we know to be an atrocious wrong?

It may be admitted that, even after such an annunciation, our cruisers could not lawfully seize a Spanish slaver, cleared out as such by the Governor of Cuba: but if the Africans on board of her could effect their own deliverance, and reach our shores, has not the government of Spain authorized us to treat them with hospitality as freemen? Could the Spanish minister, without offence, ask the government of the United States to seize these victims of fraud and felony, and treat them as property, because a colonial governor had thought proper to violate the ordinance of his king, in granting a permit to a slaver?

But in this case we make no charge upon the Governor of Cuba. A fraud upon him is proved to have been practised by Ruiz and Montez. He never undertook to assume jurisdiction over these Africans as slaves, or to decide any question in regard to them. He simply issued, on the application of Ruiz and Montez, passports for Ladino slaves from Havana to Puerto Principe. When under colour of those passports, they fraudulently put on board the Amistad, Bozals, who by the laws of Spain could not be slaves, we surely manifest no disrespect to the acts of the Governor, by giving efficacy to the laws of Spain, and denying to Ruiz and Montez the benefit of their fraud. The custom house license, to which the name of Espeleta in print was appended, was not a document given or intended to be used as evidence of property between Ruiz and Montez, and the

Africans; any more than a permit from our customhouse would be to settle conflicting claims of ownership to the articles contained in the manifest. As between the government and the shippers, it would be evidence if the negroes described in the passport were actually put on board, and were, in truth, the property of Ruiz and Montez, that they were legally shipped; that the customhouse forms had been complied with; and nothing more. But in view of facts as they appear, and are admitted in the present case, the passports seem to have been obtained by Ruiz and Montez, only as a part of the necessary machinery for the completion of a slave voyage. The evidence tends strongly to prove that Ruiz, at least, was concerned in the importation of these Africans, and that the reshipment of them under colour of passports obtained for Ladinos, as the property of Ruiz and Montez, in connection with the false representation on the papers of the schooner, that they were "passengers for the government," was an artifice resorted to by these slave-traders, for the double purpose of evading the scrutiny of British cruisers, and legalizing the transfer of their victims to the place of their ultimate destination. It is a remarkable circumstance, that though more than a year has elapsed, since the decree of the District Court denying the title of Ruiz and Montez, and pronouncing the Africans free, not a particle of evidence has since been produced in support of their claims. And yet, strange as it may seem, during all this time, not only the sympathies of the Spanish minister, but the powerful aid of our own government have been enlisted in their behalf!

It was the purpose of the Reporter to insert the able and interesting argument of Mr. Adams, for the African appellees; and the publication of the "Reports" has been postponed in the hope of obtaining it, prepared by himself. It has not been received. As many of the points presented by Mr. Adams, in the discussion of the cause, were not considered by the Court essential to its decision: and were not taken notice of in the opinion of the Court, delivered by Mr. Justice STORY, the necessary omission of the argument is submitted to with less regret.

Mr. Gilpin, the Attorney-General, in reply.

The judiciary act, which gives to this Court its powers, so far as they depend on the legislature, directs that, on an appeal from the decree of an inferior Court, this Court shall render such judgment as the Court below did, or should have rendered. It is to obtain from it such a decree in this case, that the United States present themselves here as appellants.

At the threshold of their application, the right so to present themselves is denied. They are to be turned away, as suitors having no claim to such interposition. The argument has gone a step further; it seems now to be contended, that their appearance in the Court below, which was not then objected to, is to be regarded as destitute of right, equally with their present appearance here. They are not even mere interlopers, seeking justice without warrant; they are dictators, in the form of supplicants, and their suggestions to the Court, and their application for its judgment, upon solemn and important questions of fact, are distorted by an ingenious logic which it is difficult to follow. Applications, made without the slightest expression of a wish, except to obtain that judgment, and in a form which, it might be supposed, would secure admission into any Court, are repudiated, under the harsh name of "executive interference." Yet in what single respect do the facts of this case sustain such allegations? How can it be justly said that there has been any "executive interference," not resulting from the adoption of that course which public duty made incumbent; and conducted in the manner, and in that manner only, which was required by that sense of public duty, from which, no officer, possessing a due regard for the obligations of his trust, will ever shrink?

In what situation is the case when it is first presented to the notice of the government of the United States? On nearly, if not exactly the same day that the Secretary of State receives from the minister of Spain an official communication, dated at New York, and stating the facts connected with the schooner L'Amistad, then just brought within the territory of the United States; stating also, that the vessel is a Spanish vessel, laden with merchandise, and with sundry negro slaves on board, accompanied with all the documents required by the laws of Spain, for navigating a vessel, and for proving ownership of

property; and then making an application to the government of the United States to interpose, so that the property thus within our territory, might be restored to its owners pursuant to the treaty; and asserting also, that the negroes, who were guilty, as he contended, of a crime for which they ought to be punished, ought to be delivered up on that account, too, pursuant to the law of nations—on or about the same day, the letter of the District Attorney, which, though dated a day earlier, is written in Connecticut, also reaches the Department of State, conveying the information that this same property and these same negroes are already within the custody and authority of the judicial tribunals of the United States, by virtue of process, civil and criminal, issued by a judge of the United States, after solemn and deliberate inquiry. The vessel, the cargo, and the negroes had been all taken possession of by a warrant issued by the Court, " as property;" they were then, at that very time, in the custody, keeping, and possession of the Court, as property, without the slightest suggestion having been made by the executive branch of the government, or even a knowledge of the fact on its part; and when its interposition is formally solicited, its first information relative to the case received, it finds the subject of the demand already under the control of the judicial branch.

In this situation, the executive government, thus appealed to and thus informed, looks to its treaty stipulations, the most solemn and binding compacts that nations know among each other, and the obligations of which can never be treated lightly, so long as good faith forms the first duty of every community. Those stipulations entered into in 1795, (1 Laws of United States, 266,) provide, in the first place, (article 6,) that each party to the treaty, the United States and Spain, shall "endeavour, by all means in their power, to protect and defend all vessels and other effects belonging to the citizens or subjects of the other, which shall be within the extent of their jurisdiction." Again, in the eighth article, it is declared, that " in case the subjects or inhabitants of either country shall, with their shipping, be forced, through stress of weather, or any other urgent necessity for seeking shelter, to enter any port of the other, they shall enjoy all favour, protection, and help." Again, in the ninth article, it is provided, that "all ships and merchandise, of what nature soever,

which shall be rescued out of the hands of any pirates or robbers on the high seas, shall be brought into some port of either state, and shall be delivered into the custody of the officers of that port, in order to be taken care of, and restored entire to the true proprietor, as soon as due and sufficient proof shall be made concerning the property thereof." In the sixteenth article it is further declared, that the liberty of navigation and commerce meant by the treaty, shall extend to all kinds of merchandise, excepting those only which are contraband, and they are expressly enumerated; and in the twenty-second article, the object of the treaty is declared to be "the extension of mutual commerce." When these stipulations were thus made, slaves were a notorious article of merchandise and traffic in each country; not only were they so in the United States, but there was a constitutional provision, prohibiting Congress from interfering to prevent their importation, as such, from abroad. This treaty, with these provisions thus solemnly and carefully framed, was renewed in 1819; was declared to be still in existence and force. It is declared, (7 Laws of United States, 624,) that every one of the articles above quoted "remains confirmed." It stands exactly as it stood in 1795; and, in the year 1821, after both governments had abolished the slave-trade, the provisions adopted in 1795 are thus, as to "every clause and article thereof," so renewed, solemnly ratified, and confirmed by the President and Senate of the United States. No clause is introduced to vary the nature or character of the merchandise; none to lessen or change the obligations, as would have been the case, had any such change been contemplated; but the two treaties, having the final date of 1821, bear the character of a single instrument.

Now these are stipulations too clear to be misunderstood; too imperative to be wantonly neglected. Could we not ask of Spain the fulfilment of every one of them towards our own citizens? If so, were we not bound, at least, to see that, through some public functionary, or by some means in which nations fulfil mutual obligations, they were performed by us to the subjects of Spain whenever the casus fœderis should arise?

Did it arise in this case? Here were unquestionably, as the representative of Spain believed and stated, a vessel and effects

of subjects of that country within our jurisdiction; here was a vessel and merchandise rescued, as he alleged, from the hands of robbers, brought into one of our ports, and already in the custody of public officers. Did not a treaty stipulation require the United States to "endeavour by all means in their power to protect and defend this property?" Did not a treaty stipulation require us to "extend to them all favour, protection, and help?" Did not a treaty stipulation bind us to "restore, entire, the property to the true proprietors, as soon as due and sufficient proof should be made concerning the same?" If not, then is there no force and meaning in language; and the words of solemn treaties are an idle breath, of which nations may be as regardless as of the passing wind.

The case then had arisen where it was the duty of the United States, as parties to this treaty, to interfere and see that its stipulations were performed. How were they to interfere? Certainly at the instance of the executive, through the medium of the judiciary, in whose custody and under whose control the property claimed already was. The 'questions incident' to due and sufficient proof of property are clearly judicial questions; but when that property is already in the custody and under the jurisdiction of a Court, they are so from necessity, as it is desirable they always should be, from choice. This position, never denied, was eloquently urged by the counsel of these negroes when they first addressed the executive on the subject, (Cong. Doc. No. 185, p. 64,) and to that view they added the request that he "would submit the question for adjudication to the tribunals of the land."

He did so. He interposed at the instance of the Spanish minister to fulfil a treaty stipulation, by causing a suggestion to be filed in the Court which had already taken cognisance of the subject-matter, and which had the property in its custody. That suggestion stated the allegation of the Spanish minister, that this was property which ought to be restored under the treaty; prayed in effect an inquiry of the Court into that fact; and requested such a decree, after such inquiry, as might enable the United States as a nation to fulfil their treaty obligations to the Spanish nation. This has been called "executive interference" and "executive dictation." To answer such a charge in

any other way than by appealing to the facts, would be to trespass on the patience of the Court.

As if such charges were felt to be insufficient, an attempt is made by argument to prove that the government of the United States had no right thus to interpose; no right to make this suggestion to the District Court. And why not? It is said, because there is no law giving this power, and it cannot be implied; because in a question of private property it must be left to the parties alone to prosecute their rights, and the parties in this case were already doing so for themselves; and because it was an interference and encroachment of the executive on the province of the Court, not sanctioned by any precedent. These are the grounds that have been taken, and it might be sufficient to say that although every one of them existed in as full force when the case was tried in the District Court, none of them were there taken; although every one of them was known before the plea and answer of the respondents, they started none of these objections. After the decree and judgment of the Court below, it is too late to start them. But there is nothing in them, whenever made.

I. The executive government was bound to take the proper steps for having the treaty executed, and these were the proper steps. A treaty is the supreme law; the executive duty is especially to take care that the laws be faithfully executed; no branch of this duty is more usual or apparent than that which is executed in connection with the proceedings and decrees of Courts. What special assignment, by act of Congress, has been made of the executive duties in the fulfilment of laws through the decrees and judgments of the judiciary? Yet it is matter of daily occurrence. What gives the District Attorney a right to file his libel against a package of goods which the law says shall be forfeited on proof being made that they are falsely invoiced, any more than to file his libel against a vessel and her cargo, which a treaty (a still higher law) declares shall be restored on proof concerning the property thereof? In the one case it is the execution of a law, by an executive officer, through the medium or in connection with the Courts; in the other case it is the execution of a treaty in a similar manner. But in the latter the duty is, if possible, more imperative, since the execution of treaties

being connected with public and foreign relations, is devolved upon the executive branch. These principles are clearly stated by this Court in the case of the Peggy, 1 Cranch, 103; and more fully in that of Williams v. The Suffolk Insurance Company, 13 Peters, 420.

As to its being a question of private property, which the parties might themselves prosecute, it is not perceived how this impairs the right, or even lessens the obligation of the United States to interfere, to the extent and in the manner they did, especially when solicited by the minister representing these parties; they appear on behalf, or at the instance of a foreign sovereignty in alliance with them, which assumes itself the rights and interests of the parties; those parties withdraw, as this record expressly shows, when they so appear; no act of theirs occurs after the interposition of the United States at the instance of the Spanish minister, and it is expressly stated that they so withdrew, because their claims were merged in that which was thus presented. This appearance of the United States is not, as has been argued, a substitution of themselves as parties in interest; it is a substitution under a treaty obligation; a substitution assumed in their public character to perform a public duty, by means of which the further prosecution of the individuals is (as the treaty intended it should be) rendered unnecessary. Besides, what is there to show that all the parties having an interest in this property were before the Court? It is nowhere so stated; and, if they were not, the objections totally fail.

How this proceeding is an interference by the executive with the Court; how it is an encroachment on the judicial department; how it is a dictation to the Court, or advice to it to do its duty, it is difficult to conceive; and therefore difficult to reply to such constructions of an act, analogous to the conduct of every proceeding in a Court, rendered necessary to or imperative upon the executive in the execution of the laws. If this libel, so definite in what it alleges and what it asks, founded on the official request of a public functionary, and intended to obtain the execution of a definite treaty obligation, be an infringement of judicial authority, it will be scarcely possible for a District Attorney, hereafter, to file an information, or, present an indictment.

Nor is it, as is alleged, without precedent. In fact, every case of a libel filed by the United States, soliciting the examination and decree of a Court in rem, is a precedent, so far as any principle is concerned. But the cases of the Exchange, the Cassius, and the Eugenia, are not to be distinguished on any ground. They were cases of property in Court, under libels of private suitors; the United States interposed, under their obligations to foreign powers. That those obligations were general, not arising by special treaty provisions, makes the cases less strong. It is said, that the property in litigation, in those cases, was to be delivered to the sovereign; is this property less in that position, when it is asked for by the representative of the sovereign? It is said they were not delivered up as property; the Exchange and Cassius were so delivered: as public property of "the Emperor Napoleon," so stated in terms, and of the French republic. The Eugenia was delivered to the consul of France, that it might be proceeded against in rem, if desired. In the forms of proceeding by the United States, and in the decrees, every thing resembles what has been done or sought for in this case. But, in fact, every instance of interposition of foreign functionaries, consuls, and others, affords a precedent. They have no right of property. They are no parties in interest. They interpose in behalf of the citizen. Did not this Court, in the case of the Bello Corrunes, 6 Wheaton, 152, where the express point was made, and the interposition of the Spanish consul, on behalf of his fellow-citizens, was resisted, sustain his right, as a public functionary, although it was admitted he could show no special authority in the particular proceeding? So in the case of the Antelope, 10 Wheaton, 66, the consul was allowed to interpose for Spanish subjects, who were actually unknown. It will hardly be denied, that where the foreign functionary may thus come into our Courts, to prosecute for the party in interest, our own functionaries may do the same. As to the case of Nash, Bee, 266, it clearly sustains, so far as the course of proceeding, by means of the judiciary, is concerned, the right and duty of the executive thus to interpose. That was an application for the restoration of a criminal under treaty stipulations. The main question was, whether this surrender belonged exclusively to the executive, or was to be effected through the medium of the judiciary,

and while Chief Justice Marshall sustained the authority of the executive, as founded on the casus fœderis, he admitted that the aid of the judiciary might, in some cases, be called in. If this were so, as to persons, it is at least equally so, in regard to property. In respect to both, proof is to be made; without proof, neither the restoration of the one nor the other can be effected; that proof is appropriately made to and passed upon, by the judicial tribunals; but as the execution of the treaty stipulation is vested in the executive, if the case is proved to the satisfaction of the judiciary, its interposition, so far as is necessary to that end, forms a proper part of the judicial proceedings.

It seems clear, then, that these objections to the duty of the executive to interpose, where the property to be restored is in the custody of the Court, cannot be sustained either by principle or authority. And such appears to be the sentiment of the counsel for the appellees, from the zeal with which they have pressed another argument, to reach the same end. That argument is, that the United States could not interpose, because the Spanish minister never had asked for the restoration of the slaves as property; and, because, if he had, he had sought it solely from the executive department, and denied the jurisdiction of the Court. Now, suppose this were so, it would be a sufficient answer to say, that, independent of the request of the foreign functionary, the United States had a treaty obligation to perform, which they were bound to perform; and that, if a request in regard to its performance was made upon grounds not tenable, this did not release the United States from their obligation on grounds which, as they knew, did properly exist. But, in point of fact, the Spanish minister did, from the first, demand these negroes, as property belonging to Spanish subjects, which ought to be restored as property under the treaty of 1795. Passages have been culled from the letters of Mr. Calderon, and Mr. Argaiz, to show that their surrender as criminals was only sought for; but the correspondence, taken together, bears no such construction. It is true they were demanded as criminals; the alleged crime had been committed on Spanish subjects; and on board of a Spanish ship; by the law of nations and by the judgment of this Court, such a case was within Spanish jurisdiction. Whether a nation has a right, by the public law,

under such circumstances, to require the extradition of the criminal, is a point on which jurists have differed; but most independent nations, if not all, have properly assumed and maintained the right to determine the question for themselves; denying the existence of any such obligation. To make the request, however, is a matter of constant occurrence; to sustain it by appeals to the law of nations, as conferring a right, is usual; we have in our own government asked for such extradition, at the very time we have denied the existence of the obligation. That the Spanish minister should, therefore, request the delivery of these persons as criminals; that he should sustain his request as one consonant to the law of nations, is not in the least a matter of surprise. But did that interfere with his demand for them also, as property? There is no reason why it should do so, and the correspondence shows that it did not, in point of fact.

The very first letter of Mr. Calderon, that of 6th September, 1839, quoted and commented upon by the counsel for the appellees, commences with a reference to the treaty stipulation, as one of the foundations and causes of his application. It is his imperious duty, he says, to claim an observance of the law of nations, and of the treaties existing between the United States and Spain. Then follow, throughout the letter, repeated references to the double character of the demand for the slaves; references which it seems scarcely possible, to misconceive. He declares, officially declares, that the vessel, " previous to her departure, obtained her clearance from the custom-house, the necessary permit from the authorities for the transportation of the negroes, a passport, and all the other documents required by the laws of Spain for navigating a vessel, and for proving ownership of property; a circumstance particularly important," in his opinion.

So Mr. Argaiz, in his letter of the 26th November, 1839, evidently pursues the same double demand; that they should be surrendered under the treaty as property, and that they are also subject to delivery as criminals. If there were a doubt as to his meaning, it must be removed, by observing his course on the passage of the resolutions adopted unanimously by the American Senate, on the 15th of April last. Those resolutions declared:

1. That a ship or vessel on the high seas, in time of peace, engaged in a lawful voyage, is, according to the law of nations,

under the exclusive jurisdiction of the state to which the ·flag belongs; as much so, as if constituting a part of its own domain.

2. That if such ship or vessel should, be forced, by stress of weather, or other unavoidable cause, into the port and under the jurisdiction of a friendly power, she and her cargo, and persons on board, with their property, and all the rights belonging to their personal relations, as established by the laws of the state to which they belong, would be placed under the protection which the laws of nations extend to the unfortunate under such circumstances.

On the passage of these resolutions, so evidently referring to the slaves as property, adopted in relation to the slaves carried into Bermuda and there set free, Mr. Argaiz claimed, for the owners of the slaves on board the Amistad, the application of the same rules. To complete the chain of evidence derived from the correspondence, we have a letter addressed by him to the Secretary of State, on the first moment that the allegation of the request being for their delivery as criminals, was made official, by the motion of the appellees lately filed in this Court—we have a note to the Secretary of State, explicitly renewing his demand in the double relation.

It is evident, then, that there was a clear, distinct, and formal request, on the part of the Spanish minister, for the delivery of these negroes, by virtue of the treaty, as the property of Spanish subjects. This fact, it has been endeavoured to establish, from the correspondence, because it has been alleged that the executive of the United States has given a construction to the request of the Spanish minister, at variance with that stated in the libel of the District Attorney. As to any legal bearing on the case, it does not appear to be material. So far as the Courts of justice are concerned, no principle is better settled than that, in relation to the political operations of the government, the judiciary adopts the construction given to their own acts and those of foreign representatives, by the proper executive departments. The opinion of this Court to that effect, is apparent in the decisions, already cited in the cases of the Peggy and the Suffolk Insurance Co.; and when, in the case of Garcia *v.* Lee, the whole matter was reviewed, with special reference to the construction of treaties, it was solemnly and deliberately affirmed. That the Depart-

ment of State regarded this request as one for the delivery of property, is evident, not merely from the libel of the District Attorney, but from the whole correspondence. To obtain a different view, we must, indeed, pick out sentences separate from their context, and give to particular phrases a meaning not consistent with the whole scope of the documents in which they are found.

But, as if the allegation, that the Spanish minister never required the restoration of these slaves as property, under the treaty, was not to be clearly established by the correspondence, it is endeavoured to be sustained by the fact, that he refused to submit to the judgment of the Court, as definitive of the rights of Spain and her subjects, under the treaty. How this refusal changes the character of his demand on the one hand, or the proper mode of proceeding by the executive on the other, it is not easy to perceive. No nation looks, in its intercourse under a treaty with another, to any but the executive government. Every nation has a right to say with what act she will be satisfied as fulfilling a treaty stipulation, the other party to the treaty reserving the same right. Has not our executive over and over again demanded redress for acts sanctioned by decrees of foreign tribunals? Have we not sought that redress by applications made directly to their executives? Has it ever been heard, that the claims of American citizens for redress from foreign governments, are precluded, because foreign Courts have decided upon them? Such has not been the case in point of fact, and such is not the course authorized by the law, and adopted in the intercourse of nations. To say, therefore, that Spain would not recognise a decree of a Court, which should award her less than the treaty, in her opinion, stipulated she should receive, does not, as it must appear, affect, in any manner whatever, the rights under it, or the mode of proceeding to be adopted by our own executive. With the latter the course was plain. The matter was already before the judiciary, a component and independent branch of the government to which it appropriately belonged. Its action is calmly waited for, as affording the just and only basis of ultimate decision by the executive.

Viewed, then, on every ground of treaty obligation, of constitutional duty, of precedent, or of international intercourse, the

interposition of the executive in the mode adopted, so far from being "unnecessary and improper," was one of duty and propriety, on receiving from the Spanish minister his official representation, and from the District Attorney the information that the matter was already in charge of the Court.

And now it may be asked, whether there is any thing in these facts to justify the censure so largely cast upon the executive for the course which it was deemed a duty to pursue; any thing that authorizes "its arraignment," to use the language of the counsel for the appellees, before the judicial tribunals, "for their judgment and censure?" Performing cautiously an international obligation; passing upon no rights private or public; submitting to the Courts of justice the facts made known officially to it; seeking the decrees of the legitimate tribunals; communicating to foreign functionaries, that by these decrees its course would be governed—it is these acts which are argued upon, as ground for censure and denunciation. With what justice may be well tested, by placing another government in the position of our own. Let us recollect that there is among nations as among men, a golden rule; let us do to them as we wish them to do to us; let us ask how we would have our own minister and representative in a foreign land to act by us, if we were thrown in like manner on a foreign shore—if a citizen of South Carolina, sailing to New Orleans with his slaves, were thus attacked, his associates killed, himself threatened with death, and carried for months in a vessel scarcely seaworthy, beneath a tropical sun. Should we blame the American minister who had asked the interposition of the Courts? Should we blame the foreign government that facilitated that interposition? Look at the case of the negroes carried to Bermuda; have we there—as we are now denounced for not doing—have we there gone as private suitors into the Courts, or have we sought redress, as nations seek it for their citizens?

The question of freedom or slavery was there brought, exactly as it was here, before the judicial tribunals, at the instance of persons who took up the cause of the slaves; the owners did not pursue their claims as a mere matter of private right; the government of the United States, through its minister, appealed to the executive government of Great Britain; sought redress from

that quarter; and received it. The value of the slaves was paid, not to the individuals, but to our own government, who took their business upon themselves, exactly as the Spanish minister has assumed that of Ruiz and Montez.

Let us then be just; let us not demand one mode of proceeding for ourselves, and practise another towards those who have an equal right to claim similar conduct at our hands.

II. The Attorney General then proceeded to reply to the position of the counsel for the appellees, that whatever might be the right of the United States as parties to the proceedings in the District and Circuit Courts, they had yet no authority to appeal, in such a case, from the decrees of those Courts, to this tribunal, and that, therefore, the present appeal should be dismissed. As no decision was given by the Court on this point, and the argument in support of the motion, and on behalf of the appellees, has not been reported, that in reply, and in behalf of the United States, as appellants, is also necessarily omitted. The position contended for by the Attorney General was, that the case was before this Court—coram judice; and that the case itself, the parties to it, and the mode of bringing it up, were all in accordance with the law authorizing appeals. If so, he submitted, that this Court has jurisdiction of it, and will revise the decree that has been pronounced by the Circuit Court, which is all that was solicited. That the highest judicial tribunal should pronounce upon the facts set out in this record, was all that the executive could desire; they present questions that appropriately belong to the judiciary, as the basis of executive action; they relate to the rights of property, and the proofs concerning it; and when the decision of that co-ordinate branch of the government, to which the examination of such questions appropriately belongs, should be made, the course of executive action would be plain.

III. The only question, then, that remains to be considered, is, was the decree erroneous?

The decree, as it stands, and as it now comes up for examination, is, that this vessel and her cargo shall be delivered up to the Spanish minister, for the Spanish owners, not entire, but after deducting one-third for salvage, to be given to Lieutenant Gedney and his associates; and that the negroes, except Antonio, shall be delivered to the President of the United States, to be

sent to Africa, pursuant to the provisions of the act of 3d March, 1819, § 2. 2 Story's Laws, 1752. Now it is submitted, that this decree is erroneous, because the vessel, cargo, and negroes were all the property of Spanish subjects, rescued from robbers, and brought into a port of the United States, and due proof concerning the property in them was made; that, therefore, the decree should have been, that they be delivered to the Spanish owners, or to the Spanish minister, for the owners, according to the stipulations of the ninth article of the treaty of 1795.

The vessel and cargo are admitted to be merchandise or property, within the meaning of the treaty. Are slaves also property or merchandise, within its meaning? That they are not, has been very elaborately argued by the counsel for the appellees; yet, it is confidently submitted that, both by the laws of Spain and of the United States, slaves are property; and a fair construction of the treaty shows that it was intended to embrace every species of property recognised by the laws of the two contracting nations. We are asked for a law to this effect; a law establishing the existence of slavery in the Spanish dominions. It might be sufficient to say, that what is matter of notorious history willl be recognised by this Court, without producing a statutory regulation; but the royal decree of 1817, which promulgates the abolition of the foreign slave trade, refers throughout to the existence of slavery in the Spanish Indies, and this Court, in many of its adjudications, has recognised its existence.

If slaves then, were, property by the laws of Spain, it might be justly concluded that, even if they were not so recognised by the United States, still they are property within the meaning of the treaty, because the intention of the treaty was to protect the property of each nation. But, in fact, slaves were, and are, as clearly recognised by them to be property, as they ever were by Spain. Our citizens hold them as property; buy and sell them as property; legislate upon them as property. State after state has been received into this Union, with the solemn and deliberate assent of the national legislature, whose constitutions, previously submitted to and sanctioned by that legislature, recognise slaves as merchandise; to be held as such, carried as such from place to place, and bought and sold as such. It has been argued that this government, as a government, never has

recognised property in slaves.   To this it is answered, that if no other proof could be adduced, these acts of the national government are evidence that it has done so.   The Constitution of the United States leaves to the states the regulation of their internal property, of which slaves were, at the time it was formed, a well known portion.   It also guaranteed and protected the rights of the states to increase this property, up to the year 1808, by importation from abroad.   How, then, can it be said, that this government, as a government, never has recognised this property?   But, if slaves be not so regarded, by what authority did the general government demand indemnity for slaves set free in Bermuda by the British government?   Is not this an act, recent in date and deliberate in conduct, showing the settled construction put upon slaves as property.   Is not the resolution of the Senate—the unanimous resolution—a declaration that slaves, though liberated as persons, and so adjudged by a foreign Court, are, in fact, by the law of nations, property, if so allowed to be held in the country to which the owner belongs?

   But it is contended that, although they may have been recognised as property by the two nations, they were not such property as was subject to restoration by the treaty.   Now, to this it may be answered, in the first place, that every reason which can be suggested for the introduction of the treaty stipulations to protect and restore property, applies as fully to slaves as to any other. It is, in states where slavery exists, a valuable species of property; it is an object of traffic; it is transported from place to place.   Can it be supposed, that the citizen of Virginia, sailing to New Orleans with his slaves, less needs the benefit of these treaty stipulations for them, than for any other property he may have on board, if he is carried into a port of Cuba, under any of the adverse circumstances for which the treaty was intended to provide?   But; again; is not the treaty so broad and general in its terms, that one of the contracting parties has no right to make an exclusion of this property, without the assent of the other?   The sixteenth article of the treaty says, it is to extend to "all kinds" of merchandise, except that which is contraband.   Was not a slave a kind of merchandise, then recognised as such by each nation, and allowed to be imported into each nation, by their respective laws?

   The treaty of 1819, which was ratified in 1821, after the slave

3 c 2

trade was abolished, but while slave property was held in both countries, renews this article as it stood in 1795. Is it possible to imagine that, if a new policy was to be adopted, there would not have been an express stipulation or change in regard to this, as there was in regard to other articles of the old treaty? If further proof were wanting, it would be found in the fact, that the executive authorities of both nations, at once and unequivocally, considered the terms of the treaty as extending to slave property. Independently of the authority which this decision on the political construction of a treaty will have with this Court, upon the principles it has laid down, it may be regarded as strong evidence of the intentions of the contracting parties; and when we see our own government and the Senate of the United States, seriously examining how far a similar case is one that falls within the class of international obligations, independent of treaty, we may give to its deliberate judgment, in the proper construction of this treaty, the highest weight.

The next inquiry is, whether the property in question was "rescued out of the hands of any pirates or robbers on the high seas, and brought into any port of the United States?" That the vessel was at anchor below low water mark when taken possession of, and consequently upon the high seas, as defined by the law of nations, is a fact not controverted; but it is objected that the negroes by whom she was held were not pirates or robbers in the sense of the treaty, and that if they were, its provisions could not apply to them, because they were themselves the persons who were rescued. That the acts committed by the negroes amount to piracy and robbery, seems too clear to be questioned. Piracy is an offence defined and ascertained by the law of nations; it is "forcible depredation on the sea, animo furandi." United States *v*. Smith, 5 Wheaton, 153. Every ingredient necessary to constitute a crime thus defined, is proved in the present case. It was the intention of the treaty, that whenever, by an act of piracy, a vessel and property were run away with—taken from the owners, who are citizens of the United States or Spain—it should, if it came into the possession of the other party, be kept by that party and restored entire. Slaves differ from other property, in the fact that they are persons as well as property; that they may be actors in the piracy; but it is not perceived how

this act, of itself, changes the rights of the owners, where they exist and are recognised by law. If they are property, they are property rescued from pirates, and are to be restored, if brought by the necessary proof within the provisions of the treaty.

What are those provisions? That "due and sufficient proof must be made concerning the property thereof."

The first inquiry "concerning property," is its identity. Is there any doubt as to the identity of these slaves? There is clearly none. Are they proved to have been slaves, owned by Spanish subjects? They are negroes, in a country where slavery exists, passing from one port of the Spanish dominions to another, in a regularly documented coasting vessel; and they are proved to be, at the time they leave Havana, in the actual possession of the persons claiming to be their owners. So far as all the prima facie evidence extends, derived from the circumstances of the case at that time, they may be regarded as slaves, as much as the negroes who accompany a planter between any two ports of the United States. This, then, is the first evidence of property—their actual existence in a state of slavery, and in the possession of their alleged owners, in a place where slavery is recognised, and exists by law.

In addition to this evidence derived from possession, Ruiz and Montez had, according to the statement of the Spanish minister, which was read by the counsel for the appellees, "all the documents required by the laws of Spain for proving ownership of property." They have a certificate, under the signature of the Governor General, countersigned or attested by the captain of the port, declaring that these negroes are the property of the Spanish citizens who are in possession of them. It has already been shown, by reference to the laws of Spain, that the powers of a Governor General in a Spanish colony are of a most plenary character. That his powers are judicial, was expressly recognised by this Court, in the case of Keene *v.* M'Donough, 8 Peters, 310. If such are the powers of this officer, and if this be a document established as emanating from him, it must be regarded as conclusive in a foreign country. The cases already cited, establish the two positions, that, as regards property on board of a vessel, the accompanying documents are the first and best evidence, especially when attended with possession; and that a

decree, or judgment, or declaration of a foreign tribunal, made within the scope of its authority, is evidence, beyond which the Courts of another country will not look. These rules are essential to international intercourse. Could it be tolerated, that where vessels, on a coasting voyage, from one port of a country to another, are driven, without fault of their own, to take refuge in the harbour of another country, the authentic evidences of property in their own country are to be disregarded? That foreign Courts are to execute the municipal laws of another country, according to their construction of them? Can it be that the Courts of this country will refuse to recognise the evidence of property, which is recognised and deemed sufficient in the country to which that property belongs? We have unquestionable evidence, that such documents as these are regarded as adequate proofs of property in Cuba. But it is said this certificate is a mere passport, and no proof of property. To this it is replied, that it is recognised as the necessary and usual evidence of property, as appears by the testimony referred to. It is true it is a passport for Ruiz, but it is not a mere personal passport; it is one to take property with him, and it ascertains and describes that property.

But we are told it must be regarded as fraudulent by this Court; and the grounds on which this assertion is made, are the evidence adduced to show that these negroes have been imported into Cuba from Africa, since the treaty between Great Britain and Spain. Is this evidence legal and sufficient to authorize this Court to declare the particular fact for which it is vouched—that the negroes were imported into Cuba contrary to law? If it is sufficient for this, does such illegal importation make the negroes free men in the island of Cuba? If it does, will this Court declare the certificate to be null and void, or leave that act to the decision of the appropriate Spanish tribunals?

In the argument submitted on the part of the United States, in opening the case, the nature of this evidence has been commented upon. It is such chiefly as is not legal evidence in the Courts of the United States. Now, the question is not as to the impression derived from such evidence, but it is whether, on testimony not legally sufficient, the declaration of a competent foreign functionary will be set aside? As if there were doubt whether a Court of the United States would so do, the admissions of Ruiz, and

of the. Attorney of the United States are vouched. Yet it is apparent that these were admissions, not of facts known to them-selves, but of impressions derived from evidence which is as much before this Court as it was before them. To neither one nor the other was the fact in question personally known. It was inferred by them from evidence now for the most part before this Court.

But, admitting the fact of the recent importation from Africa, still, nothing has been adduced to controvert the position, taken in opening, that the laws of Spain required, in such a case, and even in the case of negroes actually seized on board of a Spanish vessel on her voyage from Africa, a declaration by a Court expressly recognised by Spain, to establish their freedom. However much we may abhor the African slave trade, all nations have left to those in whose vessels it is carried on, the regulation and punishment of it. The extent to which Spain was willing to permit any other nation to interpose, where her vessels or her subjects were concerned, is carefully determined in this very treaty. The principal witness of the appellees expressly admits, that when negroes are landed, though in known violation of the treaty, it is a subject to be disposed of by the municipal law. Now, it is not pretended here, that, even if these negroes were unlawfully introduced, they have been declared free. Can, then, this Court adjudge that these negroes were free in the island of Cuba, even, if the fact of their recent importation be proved? Much more, can they assume to do it, by putting their construction on a treaty, not of the United States, but between two foreign nations; a treaty which those nations have the sole right to construe and act upon for themselves?

But, if satisfied that the Governor General has been imposed upon, and the documents fraudulently obtained, still, is the fraud to be punished and the error to be rectified in our Courts, or in those of Spain? What says Sir William Scott, in the case of the Louis, when asked what is to be done if a French ship laden with slaves, in violation of the laws of that country, is brought into an English port: " I answer," says he, " without hesitation, restore the possession which has been unlawfully divested; rescind the illegal act done by your own subject, and leave the foreigner to the justice of his own country." Can a rule more directly applicable to the present case be found? " The Courts of no

country," says Chief Justice Marshall, in the case of the Ante-
lope, " execute the penal laws of another." In the case of the
Eugenia, where a French vessel was liable to forfeiture under
the laws of France, for violating the laws prohibiting the slave
trade, Judge Story directed, not that she should be condemned in
our own Courts, but that she should be sent to France. This,
says he, " enables the foreign sovereign to exercise complete ju-
risdiction, if he shall prefer to have it remitted to his own Courts
for adjudication." - This, he afterwards adds, " makes our own
country not a principal, but an auxiliary in enforcing the interdict
of France, and subserves the great interests of universal justice."

Are not these the true principles which should govern nations
in their intercourse with each other; principles sanctioned by
great and venerated names? Are not these the principles by
which we would require other nations to be governed, when
our citizens are charged, in a foreign country, with a breach of
our own municipal laws? And is it not productive of the same
result? Do we doubt that the Courts and officers of Spain will
justly administer her own laws? Will this Court act, on the
presumption that the tribunals of a foreign and friendly nation
will fail to pursue that course which humanity, justice, and the
sacred obligations of their own laws demand? No nation has
a right so to presume, in regard to another; and, notwithstand-
ing the distrust that has been repeatedly expressed in the pro-
gress of this cause, in regard to the Spanish tribunals and the
Spanish functionaries; yet a just respect towards another and a
friendly nation; the common courtesy which will not suppose in
advance, that it will intentionally do wrong; oblige us to believe,
and warrant us in so doing, that if the laws of Spain have been
violated; if its officers have been deceived; and if these negroes
are really free; these facts will be there ascertained and acted
upon, and we shall as "auxiliaries," not principals, best " sub-
serve the cause of universal justice."

If this view be correct, and if the evidence is sufficient to
prove the property of the Spanish subjects in the island of
Cuba, the only question that remains to be considered is,
whether the acts of the slaves during the voyage changed
their condition. It has been argued strongly that they were free;
that they were "in the actual condition of freedom;" but how can

that be maintained? If slaves by the laws of Spain, they were so on board of a Spanish vessel, as much as on her soil; and will it be asserted that the same acts in the island of Cuba would have made them free? This will hardly be contended. No nation recognising slavery, admits the sufficiency of forcible emancipation. In what respect were these slaves, if such by the laws of Spain, released from slavery by their own acts of aggression upon their masters, any more than a slave becomes free in Pennsylvania, who forcibly escapes from his owner in Virginia? For this Court to say that these acts constituted a release from slavery, would be to establish for another country municipal regulations in regard to her property; and, not that only, but to establish them directly in variance with our own laws, in analogous cases. If the negroes in this case were free, it was because they were not slaves when placed on board the Amistad, not because of the acts there committed by them.

It is submitted, then, that so far as this Court is concerned, there is sufficient evidence concerning this property, to warrant its restoration pursuant to the provisions of the treaty with Spain; and that, therefore, the judgment of the Court below should be reversed, and a decree made by this Court for the entire restoration of the property.

Mr. Justice STORY delivered the opinion of the Court.

This is the case of an appeal from the decree of the Circuit Court of the District of Connecticut, sitting in admiralty. The leading facts, as they appear upon the transcript of the proceedings, are as follows: On the 27th of June, 1839, the schooner L'Amistad, being the property of Spanish subjects, cleared out from the port of Havana, in the island of Cuba, for Puerto Principe, in the same island. On board of the schooner were the captain, Ransom Ferrer, and Jose Ruiz, and Pedro Montez, all Spanish subjects. The former had with him a negro boy, named Antonio, claimed to be his slave. Jose Ruiz had with him forty-nine negroes, claimed by him as his slaves, and stated to be his property, in a certain pass or document, signed by the Governor General of Cuba. Pedro Montez had with him four other negroes, also claimed by him as his slaves, and stated to be his property, in a similar pass or document, also signed by the Governor General

[The United States *v*. The Amistad.]

of Cuba.   On the voyage, and before the arrival of the vessel at her port of destination, the negroes rose, killed the captain, and took possession of her.   On the 26th of August, the vessel was discovered by Lieutenant Gedney, of the United States brig Washington, at anchor on the high seas, at the distance of half a mile from the shore of Long Island.   A part of the negroes were then on shore at Culloden Point, Long Island; who were seized by Lieutenant Gedney, and brought on board.   The vessel, with the negroes and other persons on board, was brought by Lieutenant Gedney into the district of Connecticut, and there libelled for salvage in the District Court of the United States.   A libel for salvage was also filed by Henry Green and Pelatiah Fordham, of Sag Harbour, Long Island.   On the 18th of September, Ruiz and Montez filed claims and libels, in which they asserted their ownership of the negroes as their slaves, and of certain parts of the cargo, and prayed that the same might be "delivered to them, or to the representatives of her Catholic majesty, as might be most proper."   On the 19th of September, the Attorney of the United States, for the district of Connecticut, filed an information or libel, setting forth, that the Spanish minister had officially presented to the proper department of the government of the United States, a claim for the restoration of the vessel, cargo, and slaves, as the property of Spanish subjects, which had arrived within the jurisdictional limits of the United States, and were taken possession of by the said public armed brig of the United States; under such circumstances as made it the duty of the United States to cause the same to be restored to the true proprietors, pursuant to the treaty between the United States and Spain: and praying the Court, on its being made legally to appear that the claim of the Spanish minister was well founded, to make such order for the disposal of the vessel, cargo, and slaves, as would best enable the United States to comply with their treaty stipulations.   But if it should appear, that the negroes were persons transported from Africa, in violation of the laws of the United States, and brought within the United States contrary to the same laws; he then prayed the Court to make such order for their removal to the coast of Africa, pursuant to the laws of the United States, as it should deem fit.

[The United States *v.* The Amistad.]

On the 19th of November, the Attorney of the United States filed a second information or libel, similar to the first, with the exception of the second prayer above set forth in his former one. On the same day, Antonio G. Vega, the vice-consul of Spain, for the state of Connecticut, filed his libel, alleging that Antonio was a slave, the property of the representatives of Ramon Ferrer, and praying the Court to cause him to be delivered to the said vice-consul, that he might be returned by him to his lawful owner in the island of Cuba.

On the 7th of January, 1840, the negroes, Cinque and others, with the exception of Antonio, by their counsel, filed an answer, denying that they were slaves, or the property of Ruiz and Montez, or that the Court could, under the Constitution or laws of the United States, or under any treaty, exercise any jurisdiction over their persons, by reason of the premises; and praying that they might be dismissed. They specially set forth and insist in this answer, that they were native born Africans; born free, and still of right ought to be free and not slaves; that they were, on or about the 15th of April, 1839, unlawfully kidnapped, and forcibly and wrongfully carried on board a certain vessel on the coast of Africa, which was unlawfully engaged in the slave trade, and were unlawfully transported in the same vessel to the island of Cuba, for the purpose of being there unlawfully sold as slaves; that Ruiz and Montez, well knowing the premises, made a pretended purchase of them: that afterwards, on or about the 28th of June, 1839, Ruiz and Montez, confederating with Ferrer, (captain of the Amistad,) caused them, without law or right, to be placed on board of the Amistad, to be transported to some place unknown to them, and there to be enslaved for life; that, on the voyage, they rose on the master, and took possession of the vessel, intending to return therewith to their native country, or to seek an asylum in some free state; and the vessel arrived, about the 26th of August, 1839, off Montauk Point, near Long Island; a part of them were sent on shore, and were seized by Lieutenant Gedney, and carried on board; and all of them were afterwards brought by him into the district of Connecticut.

On the 7th of January, 1840, Jose Antonio Tellincas, and Messrs. Aspe and Laca, all Spanish subjects, residing in Cuba, filed their

claims, as owners to certain portions of the goods found on board of the schooner L'Amistad.

On the same day, all the libellants and claimants, by their counsel, except Jose Ruiz and Pedro Montez, (whose libels and claims, as stated of record, respectively, were pursued by the Spanish minister, the same being merged in his claims,) appeared, and the negroes also appeared by their counsel; and the case was heard on the libels, claims, answers, and testimony of witnesses.

On the 23d day of January, 1840, the District Court made a decree. By that decree, the Court rejected the claim of Green and Fordham for salvage, but allowed salvage to Lieutenant Gedney and others, on the vessel and cargo, of one-third of the value thereof, but not on the negroes, Cinque and others; it allowed the claim of Tellincas, and Aspe and Laca with the exception of the above-mentioned salvage; it dismissed the libels and claims of Ruiz and Montez, with costs, as being included under the claim of the Spanish minister; it allowed the claim of the Spanish vice-consul for Antonio, on behalf of Ferrer's representatives; it rejected the claims of Ruiz and Montez for the delivery of the negroes, but admitted them for the cargo, with the exception of the above-mentioned salvage; it rejected the claim made by the Attorney of the United States on behalf of the Spanish minister, for the restoration of the negroes under the treaty; but it decreed that they should be delivered to the President of the United States, to be transported to Africa, pursuant to the act of 3d March, 1819.

From this decree the District Attorney, on behalf of the United States, appealed to the Circuit Court, except so far as related to the restoration of the slave Antonio. The claimants, Tellincas, and Aspe and Laca, also appealed from that part of the decree which awarded salvage on the property respectively claimed by them. No appeal was interposed by Ruiz or Montez, or on behalf of the representatives of the owners of the Amistad. The Circuit Court, by a mere pro forma decree, affirmed the decree of the District Court, reserving the question of salvage upon the claims of Tellincas, and Aspe and Laca. And from that decree the present appeal has been brought to this Court.

The cause has been very elaborately argued, as well upon the

[The United States v. The Amistad.]

merits, as upon a motion on behalf of the appellees to dismiss the appeal. On the part of the United States, it has been contended, 1. That due and sufficient proof concerning the property has been made to authorize the restitution of the vessel, cargo, and negroes to the Spanish subjects on whose behalf they are claimed pursuant to the treaty with Spain, of the 27th of October, 1795. 2. That the United States had a right to intervene in the manner in which they have done, to obtain a decree for the restitution of the property, upon the application of the Spanish minister. These propositions have been strenuously denied on the other side. Other collateral and incidental points have been stated, upon which it is not necessary at this moment to dwell.

Before entering upon the discussion of the main points involved in this interesting and important controversy, it may be necessary to say a few words as to the actual posture of the case as it now stands before us. In the first place, then, the only parties now before the Court on one side, are the United States, intervening for the sole purpose of procuring restitution of the property as Spanish property, pursuant to the treaty, upon the grounds stated by the other parties claiming the property in their respective libels. The United States do not assert any property in themselves, or any violation of their own rights, or sovereignty, or laws, by the acts complained of. They do not insist that these negroes have been imported into the United States, in contravention of our own slave trade acts. They do not seek to have these negroes delivered up for the purpose of being transported to Cuba as pirates or robbers, or as fugitive criminals found within our territories, who have been guilty of offences against the laws of Spain. They do not assert that the seizure, and bringing the vessel, and cargo, and negroes into port, by Lieutenant Gedney, for the purpose of adjudication, is a tortious act. They simply confine themselves to the right of the Spanish claimants to the restitution of their property, upon the facts asserted in their respective allegations.

In the next place, the parties before the Court on the other side as appellees, are Lieutenant Gedney, on his libel for salvage, and the negroes, (Cinque, and others,) asserting themselves, in their answer, not to be slaves, but free native Africans, kidnapped

in their own country, and illegally transported by force from that country; and now entitled to maintain their freedom.

No question has been here made, as to the proprietary interests in the vessel. and cargo. It is admitted that they belong to Spanish subjects, and that they ought to be restored. The only point on this head is, whether the restitution ought to be upon the payment of salvage or not? The main controversy is, whether these negroes are the property of Ruiz and Montez, and ought to be delivered up; and to this, accordingly, we shall first direct our attention.

It has been argued on behalf of the United States, that the Court are bound to deliver them up, according to the treaty of 1795, with Spain, which has in this particular been continued in full force, by the treaty of 1819, ratified in 1821. The sixth article of that treaty, seems to have had, principally, in view cases where the property of the subjects of either state had been taken possession of within the territorial jurisdiction of the other, during war. The eighth article provides for cases where the shipping of the inhabitants of either state are forced, through stress of weather, pursuit of pirates, or enemies, or any other urgent necessity, to seek shelter in the ports of the other. There may well be some doubt entertained, whether the present case, in its actual circumstances, falls within the purview of this article. But it does not seem necessary, for reasons hereafter stated, absolutely to decide it. The ninth article provides, "that all ships and merchandise, of what nature soever, which shall be rescued out of the hands of any pirates or robbers, on the high seas, shall be brought into some port of either state, and shall be delivered to the custody of the officers of that port, in order to be taken care of and restored entire to the true proprietor, as soon as due and sufficient proof shall be made concerning the property thereof." This is the article on which the main reliance is placed on behalf of the United States, for the restitution of these negroes. To bring the case within the article, it is essential to establish, First, That these negroes, under all the circumstances, fall within the description of merchandise, in the sense of the treaty. Secondly, That there has been a rescue of them on the high seas, out of the hands of the pirates and robbers; which, in the present case, can only be, by showing that they

themselves are pirates and robbers; and, Thirdly, That Ruiz and Montez, the asserted proprietors, are the true proprietors, and have established their title by competent proof.

If these negroes were, at the time, lawfully held as slaves under the laws of Spain, and recognised by those laws as property capable of being lawfully bought and sold; we see no reason why they may not justly be deemed within the intent of the treaty, to be included under the denomination of merchandise, and, as such, ought to be restored to the claimants: for, upon that point, the laws of Spain would seem to furnish the proper rule of interpretation. But, admitting this, it is clear, in our opinion, that neither of the other essential facts and requisites has been established in proof; and the onus probandi of both lies upon the claimants to give rise to the casus fœderis. It is plain beyond controversy, if we examine the evidence, that these negroes never were the lawful slaves of Ruiz or Montez, or of any other Spanish subjects. They are natives of Africa, and were kidnapped there, and were unlawfully transported to Cuba, in violation of the laws and treaties of Spain, and the most solemn edicts and declarations of that government. By those laws, and treaties, and edicts, the African slave trade is utterly abolished; the dealing in that trade is deemed a heinous crime; and the negroes thereby introduced into the dominions of Spain, are declared to be free. Ruiz and Montez are proved to have made the pretended purchase of these negroes, with a full knowledge of all the circumstances. And so cogent and irresistible is the evidence in this respect, that the District Attorney has admitted in open Court, upon the record, that these negroes were native Africans, and recently imported into Cuba, as alleged in their answers to the libels in the case. The supposed proprietary interest of Ruiz and Montez, is completely displaced, if we are at liberty to look at the evidence or the admissions of the District Attorney.

If, then, these negroes are not slaves, but are kidnapped Africans, who, by the laws of Spain itself, are entitled to their freedom, and were kidnapped and illegally carried to Cuba, and illegally detained and restrained on board of the Amistad; there is no pretence to say, that they are pirates or robbers. We may lament the dreadful acts, by which they asserted their liberty, and took possession of the Amistad, and endeavoured to regain their native

country; but they cannot be deemed pirates or robbers in the sense of the law of nations, or the treaty with Spain, or the laws of Spain itself; at least so far as those laws have been brought to our knowledge. Nor do the libels of Ruiz or Montez assert them to be such.

This posture of the facts would seem, of itself, to put an end to the whole inquiry upon the merits. But it is argued, on behalf of the United States, that the ship, and cargo, and negroes were duly documented as belonging to Spanish subjects, and this Court have no right to look behind these documents; that full faith and credit is to be given to them; and that they are to be held conclusive evidence in this cause, even although it should be established by the most satisfactory proofs, that they have been obtained by the grossest frauds and impositions upon the constituted authorities of Spain. To this argument we can, in no wise, assent. There is nothing in the treaty which justifies or sustains the argument. We do not here meddle with the point, whether there has been any connivance in this illegal traffic, on the part of any of the colonial authorities or subordinate officers of Cuba; because, in our view, such an examination is unnecessary, and ought not to be pursued, unless it were indispensable to public justice, although it has been strongly pressed at the bar. What we proceed upon is this, that although public documents of the government, accompanying property found on board of the private ships of a foreign nation, certainly are to be deemed prima facie evidence of the facts which they purport to state, yet they are always open to be impugned for fraud; and whether that fraud be in the original obtaining of these documents, or in the subsequent fraudulent and illegal use of them, when once it is satisfactorily established, it overthrows all their sanctity, and destroys them as proof. Fraud will vitiate any, even the most solemn transactions; and an asserted title to property, founded upon it, is utterly void. The very language of the ninth article of the treaty of 1795, requires the proprietor to make due and sufficient proof of his property. And how can that proof be deemed either due or sufficient, which is but a connected, and stained tissue of fraud? This is not a mere rule of municipal jurisprudence. Nothing is more clear in the law of nations, as an established rule to regulate their rights, and duties,

and intercourse, than the doctrine, that the ship's papers are but prima facie evidence, and that, if they are shown to be fraudulent, they are not to be held proof of any valid title. This rule is familiarly applied, and, indeed, is of every-days occurrence in cases of prize, in the contests between belligerents and neutrals, as is apparent from numerous cases to be found in the Reports of this Court; and it is just as applicable to the transactions of civil intercourse between nations in times of peace. If a private ship, clothed with Spanish papers, should enter the ports of the United States, claiming the privileges, and immunities, and rights belonging to bona fide subjects of Spain, under our treaties or laws, and she should, in reality, belong to the subjects of another nation, which was not entitled to any such privileges, immunities, or rights, and the proprietors were seeking, by fraud, to cover their own illegal acts, under the flag of Spain; there can be no doubt, that it would be the duty of our Courts to strip off the disguise, and to look at the case according to its naked realities. In the solemn treaties between nations, it can never be presumed that either state intends to provide the means of perpetrating or protecting frauds; but all the provisions are to be construed as intended to be applied to bona fide transactions. The seventeenth article of the treaty with Spain, which provides for certain passports and certificates, as evidence of property on board of the ships of both states, is, in its terms, applicable only to cases where either of the parties is engaged in a war. This article required a certain form of passport to be agreed upon by the parties, and annexed to the treaty. It never was annexed; and, therefore, in the case of the Amiable Isabella, 6 Wheaton, 1, it was held inoperative.

It is also a most important consideration in the present case, which ought not to be lost sight of, that, supposing these African negroes not to be slaves, but kidnapped, and free negroes, the treaty with Spain cannot be obligatory upon them; and the United States are bound to respect their rights as much as those of Spanish subjects. The conflict of rights between the parties under such circumstances, becomes positive and inevitable, and must be decided upon the eternal principles of justice and international law. If the contest were about any goods on board of this ship, to which American citizens asserted a title, which was

denied by the Spanish claimants, there could be no doubt of the right of such American citizens to litigate their claims before any competent American tribunal, notwithstanding the treaty with Spain. A fortiori, the doctrine must apply where human life and human liberty are in issue; and constitute the very essence of the controversy. The treaty with Spain never could have intended to take away the equal rights of all foreigners, who should contest their claims before any of our Courts, to equal justice; or to deprive such foreigners of the protection given them by other treaties, or by the general law of nations. Upon the merits of the case, then, there does not seem to us to be any ground for doubt, that these negroes ought to be deemed free; and that the Spanish treaty interposes no obstacle to the just assertion of their rights.

There is another consideration growing out of this part of the case, which necessarily rises in judgment. It is observable, that the United States, in their original claim, filed it in the alternative, to have the negroes, if slaves and Spanish property, restored to the proprietors; or, if not slaves, but negroes who had been transported from Africa, in violation of the laws of the United States, and brought into the United States contrary to the same laws, then the Court to pass an order to enable the United States to remove such persons to the coast of Africa, to be delivered there to such agent as may be authorized to receive and provide for them. At a subsequent period, this last alternative claim was not insisted on, and another claim was interposed, omitting it; from which the conclusion naturally arises that it was abandoned. The decree of the District Court, however, contained an order for the delivery of the negroes to the United States, to be transported to the coast of Africa, under the act of the 3d of March, 1819, ch. 224. The United States do not now insist upon any affirmance of this part of the decree; and, in our judgment, upon the admitted facts, there is no ground to assert that the case comes within the purview of the act of 1819, or of any other of our prohibitory slave trade acts. These negroes were never taken from Africa, or brought to the United States in contravention of those acts. When the Amistad arrived she was in possession of the negroes, asserting their freedom; and in no sense could they possibly intend to import themselves here as

slaves, or for sale as slaves. In this view of the matter, that part of the decree of the District Court is unmaintainable, and must be reversed.

The view which has been thus taken of this case, upon the merits, under the first point, renders it wholly unnecessary for us to give any opinion upon the other point, as to the right of the United States to intervene in this case in the manner already stated. We dismiss this, therefore, as well as several minor points made at the argument.

As to the claim of Lieutenant Gedney for the salvage service, it is understood that the United States do not now desire to interpose any obstacle to the allowance of it, if it is deemed reasonable by the Court. It was a highly meritorious and useful service to the proprietors of the ship and cargo; and such as, by the general principles of maritime law, is always deemed a just foundation for salvage. The rate allowed by the Court, does not seem to us to have been beyond the exercise of a sound discretion, under the very peculiar and embarrassing circumstances of the case.

Upon the whole, our opinion is, that the decree of the Circuit Court, affirming that of the District Court, ought to be affirmed, except so far as it directs the negroes to be delivered to the President, to be transported to Africa, in pursuance of the act of the 3d of March, 1819; and, as to this, it ought to be reversed: and that the said negroes be declared to be free, and be dismissed from the custody of the Court, and go without day.

Mr. Justice BALDWIN dissented.

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States, for the District of Connecticut, and was argued by counsel. On consideration whereof, it is the opinion of this Court, that there is error in that part of the decree of the Circuit Court, affirming the decree of the District Court, which ordered the said negroes to be delivered to the President of the United States, to be transported to Africa, in pursuance of the act of Congress, of the 3d of March, 1819; and that, as to that part, it ought to be reversed: and, in all other respects, that the said decree of the

Circuit Court ought to be affirmed. It is therefore ordered adjudged, and decreed by this Court, that the decree of the said Circuit Court be, and the same is hereby, affirmed, except as to the part aforesaid, and as to that part, that it be reversed; and that the cause be remanded to the Circuit Court, with directions to enter, in lieu of that part, a decree, that the said negroes be, and are hereby, declared to be free, and that they be dismissed from the custody of the Court, and be discharged from the suit, and go thereof quit without day.